Darren William SADLIER, Plaintiff,

v.

Hon. Lynn PAYNE, Kenneth R.
Wallentine, and John C.
Beaslin, Defendants.

No. 2:97–CV–0527J.

United States District Court,
D. Utah,
Central Division.

Aug. 26, 1997.

Darren William Sadlier, Vernal, UT, pro
se.

Dan R. Larsen, Asst. Atty. Gen., Jan Gra-
ham, Atty. Gen., Salt Lake City, UT, for
Defendant Payne.

Peter Stirba, Linette B. Hutton, Stirba &
Hathaway, Salt Lake City, UT, for Defen-
dant Wallentine.

John C. Beaslin, Vernal, UT, for Defen-
dant Beaslin.

## MEMORANDUM OPINION
## AND ORDER

JENKINS, Senior District Judge.

On August 25, 1997, the Court held a hearing on defendants' motions to dismiss and all pending motions. The plaintiff Darren William Sadlier, currently an inmate at the Utah State Prison, did not appear and did not file any response to the defendants' motions. Dan R. Larsen appeared on behalf of defendant Lynn Payne and Linette B. Hutton appeared on behalf of defendant Kenneth R. Wallentine. The Court having reviewed the motions and memoranda submitted by the parties, and having heard oral argument from the parties present, and having fully considered the same, and for reasons discussed below and stated on the record at the August 25, 1997 hearing, finds that the plaintiff has failed to state a claim upon which relief can be granted as to each of the defendants and grants each defendants' Motion to Dismiss. Further, because plaintiff's claims for damages are based on several purported constitutional violations that occurred in relation to his underlying state criminal conviction, claims that would effectively call into question the lawfulness of his conviction, the plaintiff must first show that his conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or called into question by a federal court's issuance of a writ of habeas corpus.

### Factual Summary

On January 12, 1996, the plaintiff was a defendant in a criminal proceeding held in the Eighth District Court for the State of Utah. The defendants in this action, Lynn Payne, Kenneth R. Wallentine, and John C. Beaslin, acted respectively as the judge, the prosecutor, and defense counsel at plaintiff's criminal proceeding. The plaintiff pled guilty to the charges (relating to a probation violation) and was sentenced to the custody of the Utah State Prison. On July 7, 1997, the plaintiff commenced this action by filing his Complaint which ostensibly alleges, among other things, that the defendants have violated his civil rights, violated the United States Constitution, and committed "constructive treason" because the state criminal proceeding was conducted while an American flag adorned with yellow fringe was present in the courtroom. For these acts, the plaintiff seeks $5 million for the "loss of standing in the community and the embarrassment that incarceration has caused [him]"; an additional $5 million for "torture of body and mind"; $1 million from each defendant for each Constitutional violation; and "excessive damage" in the amount of $5 million (this in silver dollars) for "constructive treason" because the plaintiff will never again feel safe from "foreign agents" who act under "foreign flags with fringe of yellow." Each of the defendants has filed a motion to dismiss on the basis that the Complaint fails to state any claim upon which relief can be granted.

### Discussion

Insofar as plaintiff's Complaint asserts a claim against a state court judge and a state prosecutor in their respective official roles, the doctrine of absolute immunity bars any such claim. *See, e.g., Stump v. Sparkman,* 435 U.S. 349, 356–57, 98 S.Ct. 1099, 1104–05, 55 L.Ed.2d 331 (1978) (holding that doctrine of absolute immunity bars § 1983 claims against judge acting within his jurisdiction); *Imbler v. Pachtman,* 424 U.S. 409, 424–29, 96 S.Ct. 984, 992–94, 47 L.Ed.2d 128 (1976) (extending absolute immunity from § 1983 claims to prosecutors acting within their official roles). Further, because plaintiff's claims for damages are based on several purported constitutional violations that occurred in relation to his underlying state criminal convictions claims that would effectively call into question the lawfulness of his convictions the plaintiff must first show that his convictions or sentences has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or called into question by a federal court's issuance of a writ of habeas corpus. *Edwards v. Balisok,* — U.S. ——, ——, 117 S.Ct. 1584, 1588, 137 L.Ed.2d 906 (1997); *Heck v. Humphrey,* 512 U.S. 477, 486–87, 114 S.Ct. 2364, 2372–73, 129 L.Ed.2d 383 (1994). This the plaintiff has failed to do.

Moreover, the Court's review of the plaintiff's Complaint fails to yield any cognizable

claim. The Complaint filed by the plaintiff is for the most part incomprehensible. Its fifteen pages pose a number of problems, not the least of which is that the majority of the Complaint is set forth in a rambling fashion that fails to plead any factual allegations. The Complaint merely recites various excerpts from the United States Constitution, the United States Code, the Federal Rules of Civil Procedure, and the Uniform Commercial Code—the relevance of which is left to the reader's imagination.

Regrettably, the Court has become all too familiar with this type of complaint. The Court distills the plaintiff's Complaint to two basic and equally unavailing propositions: (1) plaintiff's civil rights were violated because he was sentenced in a state courtroom that displayed an American flag adorned with yellow fringe on a flagpole that may also have had atop it a yellow eagle, ball, or spear—an act amounting to a "mutilation" that divested the court of its power and converted the court into a "foreign state/power" court;[1] and (2) plaintiff's civil rights were violated because his was sentenced by a state court that did not have jurisdiction over him because his name was capitalized in court documents. (As the Court learned in an earlier but similar case, this is commonly referred to

as "being killed on paper.") As a visual aid in support of his basic proposition the plaintiff has affixed a small flag sticker to the first page of his Complaint, a sticker that apparently represents the "American flag of peace," it, of course, being without the offending yellow fringe.[2]

■ Flowing from these two basic claims the plaintiff asserts that the defendants either jointly or individually committed, among other things, the following acts: civil and criminal conspiracy to deprive the plaintiff of his civil rights; extortion (presumably because the defendants were paid for their work); mail fraud (for capitalizing the plaintiff's name in court documents); misprision of a felony; perjury of oath for not correcting the flag "mutilation"; kidnaping; assault with a deadly weapon; obstruction of justice; and deprivation of plaintiff's rights to equal protection. Indeed, much of the Complaint is devoted to the plaintiff's assertions that the defendants have violated various federal criminal statutes. The power to enforce these criminal statutes, however, has been delegated solely to the Attorney General of the United States. *See, e.g., Cok v. Cosentino,* 876 F.2d 1, 2 (1st Cir.1989) (holding that only the United States can bring an action

1. The Complaint often cites to the "law of the flag" as the repository of all the rights guaranteed a "citizen in party." The Court's search for this "law" yielded a brief and unavailing reference to maritime law, which provides that a vessel sailing into port under a flag is considered to be a part of the territory of the nation whose flag she flies. *See Carrington v. Panama Mail S.S. Co.,* 136 Misc. 850, 241 N.Y.S. 347, 348 (N.Y.Sup.Ct.1929), *rev'd on other grounds,* 232 A.D. 695, 247 N.Y.S. 674 (N.Y.A.D.1931); 36A C.J.S. *Flags* § 6 (1961); *Black's Law Dictionary* 574 (5th ed.1979). By flying the flag, the shipowner gave notice to all those who enter into contracts with the ship's master that he intends the law of that flag to regulate those contracts. Flying the flag on a vessel thus had an effect similar to the present day choice of law provisions found in many contracts. See also *Carbotrade S.p.A. v. Bureau Veritas,* 99 F.3d 86, 90 (2d Cir.1996) ("law of the flag, however, is only one of several factors to be considered" in determining law applicable in maritime cases).

Apparently, the plaintiff believes that when a court flies a yellow-fringed flag, it has created a new "foreign state/power" within the "sanctuary" or "territory of the bar" within the courtroom. Accordingly, when the court acts, it acts outside the confines of the Constitution and laws of the United States, and the judge is somehow transformed into the "Supreme Ruler" of a foreign state/power without a constitution. In addition, this action—displaying the yellow-fringed flag—apparently strips all citizens of their constitutional rights and voids all contracts between the court and a citizen in party. By crossing and entering the bar of a court displaying the offending flag, a "citizen in party" himself gives up his "common law" constitutional rights.

For reasons discussed at length, *infra,* it is obvious that the mere display of a yellow-fringed flag does not have the conversionary effect the plaintiff claims.

2. It has been the Court's experience that not only will all the papers submitted by this and similarly situated plaintiffs have the unoffending American flag of peace affixed to the first page, but in the event the plaintiff appears before the court, the plaintiff will also be personally adorned with the unoffending flag. The more demure plaintiffs settle for wearing a small flag pin on their collar or lapel. Other, more gregarious plaintiffs will place a desktop flag display on counsel's table or pin a large American flag of peace to their chest. Apparently, even though the courtroom may be displaying the offending yellow fringe flag; the plaintiffs' shrouding in the unoffending American flag of peace acts as a talisman of sorts to protect the plaintiff against jurisdictional conversion and somehow secure the plaintiff's "common law" constitutional rights.

for criminal conspiracy to deprive another of their civil rights). No private right of action exists. See Newcomb v. Ingle, 827 F.2d 675, 676 n. 1 (10th Cir.1987) (violation of criminal conspiracy under 18 U.S.C. § 241 does not provide for a private cause of action). Thus, the plaintiff has no standing to assert these claims.

Moreover, the plaintiff asserts that because the defendants acted in a court that displayed the offending yellow-fringed flag they engaged in "constructive treason" by "betraying the state into the hands of a foreign power." Yet the doctrine of constructive treason has never been adopted in the United States.

■ Conceptually, constructive treason "is an attempt to establish treason by circumstantiality, and not by the simple genuine letter of the law, and therefore is highly dangerous to public freedom." 87 C.J.S. Treason § 1 (1954). This doctrine developed under English law where it was made a crime to "compass or imagine the Death of … the King." Steffan v. Perry, 41 F.3d 677, 713 (D.C.Cir.1994) (Wald, J. dissenting) (quoting Statute of Treasons, 25 Edw. III). "This became the crime of 'constructive treason,' which was enforced against supposed 'compassers' and 'imaginers' even when no overt act other than mere words or agreement corroborated an intent to carry out the regicide." Id. (citations omitted). This doctrine, however, is expressly repudiated by the Constitution, which states that "treason against the United States consists only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort…. [and that] [n]o person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court." U.S. Const. art. III, § 3. By its express language, the Constitution limits conviction for the crime of treason to particular overt acts. No other form of treason has been recognized. Even though the plaintiff has no standing to enforce the criminal law in a private civil action, the plaintiff's claim of constructive treason is contrary to the express words of the Constitution and, therefore, has no merit whatsoever.

■ In several places in the Complaint, the plaintiff also claims that his Seventh Amendment right to a jury trial and a common law court was violated because, among other things, the state courtroom contained the yellow-fringed flag. Notwithstanding any other inadequacies of this claim, including the fact that the plaintiff pled guilty to the charges, the claim fails because the Seventh Amendment applies only to civil actions, not criminal proceedings. See U.S. Const. amend. VII ("In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved"); Goode v. Foster, No. 96–1348, 1996 WL 633657, at *2 (D.Kan. October 21, 1996). Plaintiff's Complaint, however, is directed at acts allegedly committed during a state criminal prosecution. It is the Sixth Amendment, incorporated as to the several states by the Fourteenth Amendment, that guarantees a defendant a right to a jury trial in a criminal proceeding. See Duncan v. Louisiana, 391 U.S. 145, 149, 88 S.Ct. 1444, 1447–48, 20 L.Ed.2d 491 (1968). Nowhere in the Complaint is there an assertion that this right has been violated. Indeed, the plaintiff acknowledged his culpability. A jury was unnecessary.

■ Even after liberally construing these claims in the light most favorable to the plaintiff, the Court finds that the Complaint as a whole fails to state a claim under 42 U.S.C. § 1983 upon which relief can be granted against any and all of the defendants. Plaintiff's claims under 42 U.S.C. § 1985 also fail to state a claim upon which relief can be granted. Among the reasons for the failure is that a cause of action under § 1985 requires a showing that the defendants discriminated against the plaintiff as the result of some racial or class-based invidious animus, an assertion not present here. See Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971); Goode, 1996 WL 633657, at *2 (dismissing § 1985 claims brought by "Sovereign" plaintiff under the jurisdiction of the "American Flag of Peace" because the complaint failed to assert any discriminatory bias).

■ Consequently, plaintiff's claims under 42 U.S.C. § 1986 likewise fail because they require as a predicate a violation of § 1985. See Abercrombie v. City of Catoosa, Okla., 896 F.2d 1228, 1230 (10th Cir.1990).

As for the core proposition asserted in the Complaint that yellow fringe on the flag somehow converted the jurisdiction of the state court into a "foreign state/power," thus denying the plaintiff his contracted rights to due process under the United States Constitution, Judge Whipple of the United States District Court for the Western District of Missouri has recently, and thoroughly, examined this theory and found it wholly without merit.[3] His analysis bears repeating here:

> The United States Code provides that "[t]he flag of the United States shall be thirteen horizontal stripes, alternate red and white; and the union of the flag shall be forty-eight stars, white in a blue field," 4 U.S.C. § 1, with one star added for each additional state, 4 U.S.C. § 2. In the 1920s, Army Regulation 260–10 required troops in the field to fly flags with a yellow silk fringe. *See* 34 Op.Att'y Gen. 483, 484–85 (1925). The Adjutant General of the Army believed that
>
> > [t]he War Department ... knows of no law which either requires or prohibits the placing of a fringe on the flag of the United States. No Act of Congress or Executive order has been found bearing on the question. In flag manufacture a fringe is not considered to be a part of the flag, and it is without heraldic significance. In the common use of the word it is a fringe and not a border. Ancient custom sanctions the use of fringe on the regimental colors and standards, but there seems to be no good reason or precedent for its use on other flags.

*Id.* at 485 (quoting an untitled circular of the Adjutant General dated Mar. 28, 1924). The United States Attorney General concurred, noting that the presence of a fringe on the flag "can not be said to constitute an unauthorized addition to the design prescribed by statute." *Id.* The President may, however, determine whether the Army or Navy display or remove fringes from their flags or standards. *Id.* at 485–86. The latest effective executive order, signed by President Eisenhower, himself a military man, did not address this issue. *See* Executive Order No. 10834, 24 Fed. Reg. 6865 (1959), reprinted in 4 U.S.C.A. § 1 notes (1985).

Therefore, [the plaintiff's] claims against the above-listed Defendants must be dismissed because his factual predicate is incorrect as a matter of law. Even if the Army or Navy do display United States flags surrounded by yellow fringe, the presence of yellow fringe does not necessarily turn every such flag into a flag of war. Far from it: in the words of the Adjutant General of the Army, "[i]n flag manufacture a fringe is not considered to be a part of the flag, and it is without heraldic significance." 34 Op.Att'y Gen. at 485. If fringe attached to the flag is of no heraldic significance, the same is true a fortiori of an eagle gracing the flagpole.

Nor are the fringe or the eagle of any legal significance. Even were [the plaintiff] to prove that yellow fringe or a flagpole eagle converted the state court's United States flag to a maritime flag of war, the Court cannot fathom how the display of a maritime war flag could limit the state court's jurisdiction. . . .

---

**3.** Others suggest that displaying an American flag with a yellow fringe is a violation of 36 U.S.C. § 176(g), which provides that "[t]he flag should never have placed upon it, nor on any part of it, nor attached to it any mark, insignia, letter. word, figure, design, picture, or drawing of any nature." Apparently, the fringe is considered to be a "design" that is attached to the flag. This part of Title 36, commonly known as the "flag code," is not, however, intended to proscribe conduct. *See Holmes v. Wallace,* 407 F.Supp. 493, 496 (M.D.Ala.), *aff'd,* 540 F.2d 1083 (5th Cir.1976) (Mem.). The repeated use of the word "should" throughout § 176 indicates a lack of penal purpose and its advisory nature. *Id.* In addition, § 176 does not proscribe any remedy for its violation. Therefore, even if a fringe on the flag could be viewed as a violation, a theory about which this Court harbors grave doubts, a private plaintiff cannot premise a civil rights violation on a claimed violation of Title 36. *See id.* at 497. Moreover, if the flag code did in fact provide for penal sanctions, it would be of dubious constitutionality. *See, e.g., United States v. Eichman,* 496 U.S. 310, 313–19, 110 S.Ct. 2404, 2406–10, 110 L.Ed.2d 287 (1990) (finding the Flag Protection Act of 1989 unconstitutional and noting that the Government's interest in protecting the symbolic value of the flag runs afoul of the First Amendment); *Spence v. Washington,* 418 U.S. 405, 412–15, 94 S.Ct. 2727, 2731–33, 41 L.Ed.2d 842 (1974) (holding unconstitutional a state statute that made it a criminal act to place "any word figure, mark, picture, design, drawing or advertisement of any nature upon any flag ... of the United States," and reversing the conviction of college student who attached a peace symbol to an American flag).

*McCann v. Greenway,* 952 F.Supp. 647, 650–51 (W.D.Mo.1997) (citations and footnotes omitted). This Court agrees with Judge Whipple that "[j]urisdiction is a matter of law, statute, and constitution, not a child's game wherein one's power is magnified or diminished by the display of some magic talisman," and adopts his analysis.[4]

One thing of interest to the Court is the fact that in this case of no great moment the courtroom was filled with interested spectators. It seems that many had been advised of the hearing by one engaged in offering high priced legal procedure seminars for money and vending high priced books.

Such persons, "vendors of scholarship and opinion," should be less concerned with esoteric theories as to the effect on state judicial power by the presence of fringed flag, and more concerned with dealing honestly and fairly with those persons from whom they extract money in return for spurious scholarship and flawed opinions long since repudiated. Those who feel put upon should not hesitate to call the matter to the appropriate state authorities.

Accordingly, for the multitude of reasons mentioned above,

**IT IS ORDERED** that defendants' motions to dismiss are GRANTED and defendants' motions to quash service of process are GRANTED.

**IT IS FURTHER ORDERED** that plaintiff's Complaint is DISMISSED with prejudice.

---

4. Several other Courts have considered similar arguments and are in agreement. *See Schneider v. Schlaefer,* 975 F.Supp. 1160, 1162–64 (E.D.Wis.1997) (dismissing claims as an "absurdity" and noting that in the future claims based on these flag theories will be deemed "frivolous and sanctionable"); *Slangal v. Cassel,* 962 F.Supp. 1214, 1216 (D.Neb.1997) ("invocation of 'flag' jurisdiction is absurd"); *United States v. Greenstreet,* 912 F.Supp. 224, 229 (N.D.Tex.1996) (rejecting argument that a federal court is limited to admiralty jurisdiction because it displays a fringed flag); *Vella v. McCammon,* 671 F.Supp. 1128, 1129 (S.D.Tex.1987) (rejecting argument that a federal court lacks jurisdiction to impose penalties for civil and criminal contempt because its flag is fringed); *Commonwealth v. Appel,* 438 Pa.Super. 214, 652 A.2d 341, 343 (1994) (rejecting argument that a fringed flag in a state courtroom conferred on the court admiralty or maritime jurisdiction).