**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 25 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOHN VINCENT MACKOVICH,

Defendant-Appellant.

No. 99-2006
No. 99-2179

APPEAL FROM UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. CR-98-343-LH)

Vicki Mandell-King, Assistant Federal Public Defender, (Michael G. Katz, Federal Public Defender, with her on the brief), Denver, Colorado, for the appellant.

Gregory J. Fouratt, Assistant United States Attorney (John J. Kelly, United States Attorney, with him on the brief), Albuquerque, New Mexico, for the appellee.

Before **BRISCOE**, **ANDERSON**, and **LUCERO**, Circuit Judges.

**BRISCOE**, Circuit Judge.

John Mackovich appeals his conviction and sentence for armed bank robbery (18 U.S.C. §§ 2113(a) and (d)) and for using and carrying a firearm during a crime of violence (18 U.S.C. § 924(c)). These convictions arose out of Mackovich's April 1998 armed robbery of the Valley Bank of Commerce in Roswell, New Mexico. Law enforcement officials quickly apprehended Mackovich and recovered the keys to the getaway vehicle, the money stolen from the bank, and the disguise used to facilitate the crime. At the time of conviction, Mackovich had two prior convictions for violent felonies. Applying what is commonly known as the "Three Strikes" statute, the district court sentenced Mackovich to life imprisonment. Mackovich contends on appeal that the district court erroneously (1) determined that he was competent to stand trial; (2) denied his request to fire his attorney and proceed pro se; and (3) rejected his argument that one of his prior convictions did not qualify as a "strike" under 18 U.S.C. § 3559. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742 and affirm.

## I. Competency

### A. Background

The district court's inquiry into Mackovich's competence began in August 1998, when Mackovich's counsel filed a "Motion To Determine Mental Competency." Record on Appeal ("ROA"), Vol. I, Doc. 20. The court granted

the motion and appointed Dr. Kenneth Bull to conduct a psychiatric examination. Dr. Bull determined that Mackovich was competent to stand trial, and submitted a one-page report setting forth his conclusions in September 1998. Approximately one month later, after Mackovich obtained a new lawyer, the government filed a motion for a supplemental psychiatric evaluation. The principal basis for the motion was that Mackovich's counsel had "learned of new information" relevant to Mackovich's fitness to stand trial, including "psychiatric reports that were generated during the pendency of [Mackovich's] 1977 prosecution for armed robbery." ROA, Vol. I, Doc. 37 at 2 (¶ 6). The district court granted this motion as well. Dr. Bull conducted a supplemental examination on November 8, 1998, and submitted another report. In this second report, Dr. Bull presented "a different psychiatric diagnosis than that derived originally. It would appear that Mr. Mackovich is not suffering primarily from a depressive disorder, but more likely a schizo-affective disorder." Supplemental Record on Appeal ("SROA"), Vol. III, Doc. 50 at 2; see also id. (stating that Mackovich "could benefit from anti-psychotic medications in addition to the anti-depressants he is currently on"). Nonetheless, Dr. Bull explained that "the new information and diagnosis obtained does not affect my judgment of Mr. Mackovich's present mental competency to stand trial." Id.

The court conducted an evidentiary hearing to explore Mackovich's

competence in November 1998. The first witness to testify at the hearing was Dr. Bull. Dr. Bull stated that he interviewed Mackovich for 30 to 40 minutes in August 1998, and that this examination led him to believe that Mackovich was competent to stand trial. Dr. Bull explained that he interviewed Mackovich for a longer period of time during the supplemental examination in November 1998, taking into account Mackovich's "previous psychiatric records." Id., Vol. II, at 6, 12-14. Dr. Bull confirmed that Mackovich was likely suffering from a schizo-affective disorder, "sort of a cross between schizophrenia and manic depressive illness." Id. at 8. According to Dr. Bull, this diagnosis was "serious" because in some individuals a schizo-affective disorder "renders them unable to manage their own lives." Id. at 8-9. In Dr. Bull's opinion, Mackovich's representation that he previously served as a "jailhouse lawyer" indicated that Mackovich possessed "knowledge of the legal process." Id. at 9, 16-17. Dr. Bull recommended additional psychiatric treatment, but affirmed his finding of competency based on Mackovich's "understand[ing of] the legal process and the charges against him." Id. at 11-12.

The only other witness who testified at the hearing was Mackovich himself. Responding to questions posed by his counsel, Mackovich stated that he believed he would be acquitted at trial and his acquittal would trigger Armageddon. Mackovich testified that he and his sister had been receiving "prophecies" from

4

God, and discussed how a burglar had broken into his house and "shot at me and my girlfriend and . . . my dog." Id. at 22-23. Mackovich also stated that prosecutors in another case wrongly accused him of soliciting a bribe, but that he was exonerated at trial according to God's plan. On cross-examination, Mackovich stated that he had been helping his current attorney by "telling him what's going to be happening, and the prophecy." Id. at 31. Mackovich testified that he had provided his attorney with information that permitted the attorney to file a notice of alibi. Mackovich stated that he believed he was charged with bank robbery, although he did not remember the name of the bank. Mackovich likewise did not remember his prior convictions, and indicated that he was not a "Three Strikes" candidate because he was innocent. Mackovich explained that he had falsely confessed to several bank robberies, including the Roswell bank robbery, because he was being pressured by prosecutors and wanted to expose government corruption.

After receiving this testimony and considering further arguments from counsel, the district court concluded that Mackovich was competent to stand trial. The court reasoned that it

> has had the defendant examined twice, and on both occasions Dr. Bull, who is a highly qualified psychiatrist, has concluded that the defendant is competent to stand trial. That is, that he understands the nature and consequences of the proceeding against him and that he is capable of assisting properly in his defense. I find that those conclusions by Dr. Bull are correct by a preponderance of the

5

evidence, and therefore the defendant is competent . . . .

Id. at 46-47. Mackovich was "especially noisy" when the court delivered its oral ruling, making "loud and inappropriate comments" while sitting at his counsel's table. Id., Vol. I, Doc. 53, at 1. [1] The court memorialized its ruling in a written order, stating that "Mackovich is not presently suffering from a mental disease or defect that impairs his ability to understand the nature and consequences of the proceedings against him or that impairs his ability to assist properly in his defense." Id. Doc. 55.

## B.    Analysis

The Constitutional principles governing competency determinations are clearly established. "It is settled that trying an incompetent defendant violates due process." Bryson v. Ward, 187 F.3d 1193, 1201 (10th Cir. 1999); see also United States v. Williams, 113 F.3d 1155, 1159 (10th Cir. 1997) (recognizing that "the criminal prosecution of an accused person while legally incompetent offends the Due Process Clause"). "Requiring that a criminal defendant be competent has a modest aim:  It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel." Godinez v. Moran, 509 U.S. 389, 402 (1993).

---

[1] Similar disruptions occurred at other times during the hearing. The government acknowledged Mackovich's outbursts in a motion in limine seeking "an order admonishing the Defendant not to engage in inappropriate and disruptive behavior during jury selection and trial . . . ." SROA, Vol. I, Doc. 53, at 1.

6

Accordingly, the test for competency is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him." Drope v. Missouri, 420 U.S. 162, 171 (1975) (quoting Dusky v. United States, 362 U.S. 402 (1960)); accord Miles v. Dorsey, 61 F.3d 1459, 1472 (10th Cir. 1995).

Our standard of review is equally clear. "Competency to stand trial is a factual determination that can be set aside only if it is clearly erroneous." United States v. Boigegrain, 155 F.3d 1181, 1189 (10th Cir. 1998), cert. denied, 119 S. Ct. 828 (1999). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. Verduzco-Martinez, 186 F.3d 1208, 1211 (10th Cir. 1999) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)). The district court "need not be correct," but its finding "must be permissible in light of the evidence." Id. (citing Bill's Coal Co. v. Board of Pub. Util. of Springfield, Missouri, 887 F.2d 242, 244 (10th Cir. 1989)). When assessing a defendant's competence, "the district court may rely on a number of factors, including medical opinion and the court's observation of the defendant's comportment." Boigegrain, 155 F.3d at 1189 (citation omitted); see also Williams, 113 F.3d at 1159 (indicating that a

7

district court may review "evidence of defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence") (citation omitted).

The district court's finding that Mackovich was competent to stand trial was not clearly erroneous. First, in both his testimony and his written reports, Dr. Bull concluded that Mackovich was able to understand the proceedings against him. See, e.g., SROA, Vol. III, Doc. 50 at 2 (setting forth Dr. Bull's "professional opinion that 1) Mr. Mackovich has a rational and factual understanding of the charges against him and their consequences and 2) he has sufficient present ability to consult with his lawyer with complete rational understanding"). Dr. Bull was the only medical expert who assessed Mackovich's competence, and the district court's reliance on his opinion is not clear error. See Verduzco-Martinez, 186 F.3d at 1212 (affirming a finding of competence based on a doctor's uncontradicted testimony); Boigegrain, 155 F.3d at 1189-90 (affirming a finding of incompetence based largely on the testimony of one psychiatrist). That much is evident from our decision in Miles: There, we held that it is not clearly erroneous for a district court to declare a defendant competent by adopting the findings of one expert and discounting the contrary findings of another. 61 F.3d at 1472-74. Second, while Mackovich admittedly "rambled and expressed paranoia" at certain points during the competency

8

hearing, see Appellant's Opening Brief at 27, the district court was in a position to determine whether Mackovich's statements were genuine or feigned. After observing Mackovich's behavior during the course of the hearing, the district court apparently accepted the prosecution's argument that Mackovich was "a desperate individual facing serious sentencing consequences" who had "nothing to lose" by malingering. SROA, Vol. II, at 46. The hearing transcript also reveals that Mackovich made statements indicating that he understood the mechanics of the criminal process. Mackovich referred to "prosecutors," "public defenders," and "the jury," implicitly acknowledged the difference between an acquittal and a conviction, and spoke of imprisonment and probation. While these statements by themselves would be insufficient to establish Mackovich's competence, see Williams, 113 F.3d at 1160 ("That defendant can recite the charges against her, list witnesses, and use legal terminology are insufficient 'for proper assistance in the defense requires an understanding that is rational as well as factual.'") (citations and internal quotation marks omitted), in combination with the district court's firsthand observations of Mackovich and Dr. Bull's medical opinion they preclude our concluding the district court's competency finding was clearly erroneous.

Mackovich's remaining objections to the district court's assessment of the evidence are insufficient to establish reversible error. Mackovich emphasizes that

9

Dr. Bull diagnosed him with a schizo-affective disorder and "recommended psychiatric treatment and antipsychotic drugs." Appellant's Opening Brief at 27. Mackovich's description of Dr. Bull's diagnosis is accurate, but this circuit has long recognized that "[t]he presence of some degree of mental disorder in the defendant does not necessarily mean that he is incompetent to . . . assist in his own defense." Wolf v. United States, 430 F.2d 443, 445 (10th Cir. 1970); accord Verduzco-Martinez, 186 F.3d at 1212; Miles, 61 F.3d at 1472. Mackovich also notes that his counsel "expressed serious and concrete concerns about his competency." Appellant's Opening Brief at 27. As we explained in Bryson, "[d]efense counsel is often in the best position to determine whether a defendant's competency is questionable. Nonetheless, the concerns of counsel alone are insufficient to establish doubt of a defendant's competency." 187 F.3d at 1201-02 (citations omitted).

Mackovich next contends that several developments after the hearing should have caused the district court to reevaluate his competence. For example, after receiving permission to address the court on the first day of trial, Mackovich made the following statement:

> This is the flag of the United States of America. Under the Federal Rules of Civil Procedure, Rule 38(a), the plaintiff's claim of the pleading is in the Constitution of the United States of America, dated 1789, Article of the Ninth, for a hearing sworn by oath of the office. Army regulations 840-10, Chapter 21AB, states the flag of the United States will be of red, white, and blue with a star for each state and

10

will be in the highest honored position over foreign flags and the president of the United States. Corporate flag of the fringe, by the law of the flag, the foreign flag of the fringe makes the jurisdiction foreign. Plaintiff is not an attorney of the law, plaintiff is a citizen and a party. How can a party plead to the matter by the subject in the court when the jurisdiction of venue, federal rules of court procedure, Rule 12(b)(3), has not been established or placed and erected plain under the flag with the fringe as to jurisdiction of the foreign power under the law of the flag? That the party is guilty until proven innocent, the Constitution of the United States rights are guaranteed to a citizen in the party innocent until proven guilty. Until the joinder of the federal rule of court procedure Rule 12(b) is established, no conversation can be understood.

ROA, Vol. III, at 72-73; see also id. at 73 (indicating that the district court responded by saying "I don't know what the purpose of that is[,] but if it's an objection to proceeding, it's overruled"). Later, believing that he and his attorney were not adequately prepared, Mackovich opted to "stand mute" and refused to testify in his own defense.

These developments do not demonstrate that the district court erred by refusing to halt the trial to reassess Mackovich's competence. It is true that "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." Drope, 420 U.S. at 181; accord Williams, 113 F.3d at 1160. Here, however, the district court's decision to proceed was not clearly erroneous for at least three reasons. First, Mackovich's "flag fringe" argument – though indisputably

11

frivolous – was not indecipherable. Litigants in this circuit and elsewhere assert with some frequency that a flag adorned with yellow fringe is "foreign" and thus robs the trial court of jurisdiction.     See Wacker v. Crow , No. 99-3071, 1999 WL 525905, at *1 (10th Cir. July 1, 1999) (unpublished disposition) (deeming "frivolous" the argument that the presence of a flag with yellow fringe precluded jurisdiction and "effectively commuted the district court into a foreign power"); Hancock v. Utah , No. 98-4139, 1999 WL 288251, at *1, *2, *3 (10th Cir. May 10, 1999) (unpublished disposition) (rejecting a plaintiff's argument that state officials "violated his right to due process by placing yellow fringe around the American flag");   Murray v. Wyoming , No. 98-8095, 1999 WL 140517, at *1 (10th Cir. Mar. 16, 1999) (unpublished disposition) (dismissing as "meritless" a plaintiff's argument that the district court and a state penitentiary lacked jurisdiction to adjudicate his claims "on the ground that both institutions display a flag with yellow fringe").  [2]  Second, the district court did, in fact, briefly revisit

---

[2] See also Joyner v. Borough of Brooklyn , No. 98 CV 2579 (RJD), 1999 WL 294780, at *1, *2 (E.D.N.Y. Mar. 18, 1999) (holding that "[t]he yellow fringe trim on the American flag has no effect on a court's jurisdiction or a defendant's constitutional or statutory rights");     Cass v. Richard Joshua Reynolds Tobacco Co. , No. 1:97CV01236, 1998 WL 834856, at *2 (M.D.N.C. Oct. 1, 1998) (rejecting the "phantasmal" claim that flags adorned with fringe are "instrumentalities of a foreign sovereign" and noting that "[f]ringed flagged jurisprudence flourishes, though frequently found frivolous");     United States v. Warren , No. 91-CR-226, 1998 WL 26406, at *1-*2 (N.D.N.Y. Jan. 22, 1998) (restating the plaintiff's position that a "foreign yellow fringe flag" is illegal and

(continued...)

the issue of competency after Mackovich complained about the flag. The district judge stated during trial that "earlier I had a competency hearing to decide on the competency of the defendant, and I ruled that he was competent, and my opinion has not changed." ROA, Vol. III, at 196. Third, Mackovich made several remarks before and during trial that suggested he understood the proceedings. Prior to jury selection, for instance, Mackovich implicitly acknowledged that he was charged with robbery when he requested permission to wear at trial the clothes he had on at the time of his arrest: "I had new clothes that the FBI took as evidence and apparently they're not matching any description of the robber. I

---

[2](...continued)
concluding that "one could rightly call" such an argument "gibberish"); Sadlier v. Payne, 974 F. Supp. 1411, 1415-16 (D. Utah 1997) (repudiating a plaintiff's claim that "yellow fringe on the flag somehow converted the jurisdiction of the state court into a 'foreign state/power'"); Schneider v. Schlaefer, 975 F. Supp. 1160, 1161-64 & n.1 (E.D. Wis. 1997) (noting a plaintiff's attempt to invoke "Army Regulation 840-10" and stating that "flag fringe" jargon is "regrettably familiar to . . . federal courts around the country"); McCann v. Greenway, 952 F. Supp. 647, 649-51 (W.D. Mo. 1997) (discussing army regulations and holding that "[e]ven if the Army or Navy do display United States flags surrounded by yellow fringe, the presence of yellow fringe does not necessarily turn every such flag into a flag of war"); United States v. Greenstreet, 912 F. Supp. 224, 229 (N.D. Tex. 1996) (recognizing that a number of litigants have "attempted to persuade the judiciary that fringe on an American flag denotes a court of admiralty" and thereby limits federal jurisdiction); United States v. Schiefen, 926 F. Supp. 877, 884 (D.S.D. 1995) (concluding that "[f]ederal jurisdiction is determined by statute, not by whether the flag flown is plain or fringed"); Vella v. McCammon, 671 F. Supp. 1128, 1129 (S.D. Tex. 1987) (rebuffing as "totally frivolous" the argument that a court lacks jurisdiction because "[a] flag has yellow fringes on it").

don't see any reason why I shouldn't be having these to wear, Your Honor."    Id.,

Vol. II, at 10. [3]  Mackovich likewise demonstrated at least passing familiarity with

courtroom rules and procedures when he objected at trial to the government's

motion to require him to wear the disguise used by the bank robber:  "Your

Honor, there haven't been any hair samples or fibers to match or testing.  I would

object to this as being highly prejudicial, anyway."    Id., Vol. IV, at 442.  The

district court's repeated findings of competency are supported by the record and

are not clearly erroneous.

## II.  Self-Representation

### A.    Background

Mackovich's claim that the district court denied his constitutional right to

self-representation revolves around the following facts.  On October 30, 1998,

one month prior to the November 30, 1998, trial date, the district court issued an

order notifying the parties of the trial date.  On November 13, 1998, the district

court found Mackovich competent to stand trial.  Six days later, Mackovich's

---

[3] In addition, Mackovich asserted in open court prior to trial that he had been a "licensed counselor," a member of the Roswell Job Corps, and an employee at a hospital associated with "psychology education services." ROA, Vol. II, at 13.  Mackovich stated that he was "quite competent," and opined that: "It's been my attorney's ploy to find me incompetent, Your Honor.  I have never at any time given any psychiatrist or attorneys reason to believe I was incompetent.  And it's just a matter that they are afraid of dealing with this case and investigating it and doing the leg work."    Id.

attorney filed a motion seeking leave to withdraw as counsel, noting that he had been "discharged" by Mackovich. SROA, Vol. I, Doc. 57, at 1. Mackovich's attorney filed a motion for a continuance on November 23, 1998, stating (among other things) that Mackovich "discharged Counsel on November 16, 1998 and is attempting to represent himself. Apparently [Mackovich] has filed his own motions, including an entry pro se and others that defense counsel has not seen or had an opportunity to review. A rift currently exists between counsel and client." Id., Doc. 61, at 1.

In a written order dated November 24, 1998, the district court denied the motion for a continuance, as well as the motion by Mackovich's counsel to withdraw. At the outset, the court observed that

> Defendant's counsel makes reference to some motions authored by Mr. Mackovich himself including a motion to proceed pro se, however, no motions other than those filed by counsel have been as yet filed with the Court. At the request of the Court, the Defendant's counsel has been provided with copies of these "pro-se" motions. Although not formally before the Court, the issues raised in the Defendant's pro se Motion for Substitution of Counsel and pro se Motion for Continuance of Trial, are similar to those filed by his counsel . . . .

ROA, Vol. I, Doc. 56, at 2 (citation omitted). The court found that "[t]he vague reference by counsel to an effort by Mr. Mackovich to represent himself is not sufficient to trigger an inquiry into whether the Defendant is attempting to knowingly and voluntarily waive his right to counsel." Id. As an alternative

15

basis for denying the motion, the court concluded that, even assuming

Mackovich's request to proceed pro se could be characterized as unequivocal, it

was untimely and an effort to delay the trial:

> This case has been set for trial since June 8, 1998, and after the Court granted Defendant's three previous motions for continuances, the current setting was noticed at the end of October of this year. The Defendant has been represented by Mr. McIntyre since September 29, 1998, and it was not until Mr. McIntyre failed to secure a plea agreement to the Defendant's liking that Mr. Mackovich apparently began to seek to represent himself. This request, even if made today, would be untimely. The Defendant's motion has not yet been filed and the trial is set to commence in five days. Clearly, this is merely an effort to again delay the trial, and is an abuse of the judicial process. The Court will not countenance such tactics. Notwithstanding the Court's understanding that Mr. Mackovic[h] may wish to represent himself, the Court will not commence with a hearing on this issue as no formal request is currently before the Court and such a request would be untimely.

Id. at 3 (citations omitted).

Mackovich next made mention of a desire to represent himself shortly

before the commencement of trial on November 30, 1998. Prior to jury selection,

Mackovich confirmed that he had attempted to file motions with the court. He

asserted that neither he nor his attorney was ready to try the case, [4] and that it

would be unjust and a "farce" if he did not receive "at least a few weeks' time to

allow [him] to prepare and gather witnesses." ROA, Vol. II, at 13. Mackovich

---

[4] Although Mackovich represented to the court that his counsel was not prepared for trial, his counsel stated on the record that he was prepared.

16

renewed his "motion for a continuance to allow Mr. McIntyre a chance to prepare," and then indicated that he would have "a better chance" if he proceeded pro se because "Mr. McIntyre doesn't have one witness on my behalf." Id. at 13-14. Mackovich closed by reiterating his request "for a continuance to represent myself or to seek other counsel." Id. at 14. When the district court denied Mackovich's oral motion on the grounds stated previously in the November 24 order, Mackovich spoke again: "Your Honor, without being prepared for this trial and without having effective assistance of counsel, I refuse to participate. I stand mute, and I wish to have an order for my attorney to stand mute. This would just be a mockery of justice. I don't want him to participate in it; neither do I." Id. at 15.

**B.    Analysis**

A criminal defendant has a constitutional and a statutory right to self-representation. The former is expressly recognized in Faretta v. California, 422 U.S. 806, 834-36 (1975), while the latter derives from 28 U.S.C. § 1654. When exercised, the right of self-representation "usually increases the likelihood of a trial outcome unfavorable to the defendant." McKaskle v. Wiggins, 465 U.S. 168, 177 n.8 (1984). As a result, "its denial is not amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless." Id.; accord United States v. Baker, 84 F.3d 1263, 1264 (10th Cir.

17

1996). To invoke the right, a defendant must meet several requirements. First, the defendant must "clearly and unequivocally" assert his intention to represent himself. United States v. Floyd, 81 F.3d 1517, 1527 (10th Cir. 1996). Second, the defendant must make this assertion in a timely fashion. United States v. McKinley, 58 F.3d 1475, 1480 (10th Cir. 1995). Third, the defendant must "knowingly and intelligently" relinquish the benefits of representation by counsel. Boigegrain, 155 F.3d at 1179. To ensure that the defendant's waiver of counsel is knowing and intelligent, the trial judge should "conduct a thorough and comprehensive formal inquiry of the defendant on the record to demonstrate that the defendant is aware of the nature of the charges, the range of allowable punishments and possible defenses, and is fully informed of the risks of proceeding pro se." United States v. Willie, 941 F.2d 1384, 1388 (10th Cir. 1991); accord United States v. Padilla, 819 F.2d 952, 959 (10th Cir. 1987).

Mackovich contends on appeal that the district court misapplied these decisions when it denied his request to proceed pro se. When evaluating such a claim, we review the district court's finding of historical facts for clear error. Boigegrain, 155 F.3d at 1185. We review de novo whether a constitutional violation actually occurred. Id.; cf. United States v. Taylor, 113 F.3d 1136, 1140 (10th Cir. 1997) (stating that "[w]e review de novo the question of whether a waiver of counsel is voluntary, knowing, and intelligent" under the Sixth

18

Amendment).

We turn first to the requirement that a defendant "clearly and unequivocally" assert his intention to represent himself. This requirement "is necessary to protect against an inadvertent waiver of the right to counsel by a defendant's occasional musings on the benefits of self-representation." United States v. Frazier-El, 204 F.3d 553, 558 (4th Cir. 2000) (internal quotations omitted). The requirement "also prevents a defendant from taking advantage of and manipulating the mutual exclusivity of the rights to counsel and self-representation." Id. at 559; see United States v. Reddeck, 22 F.3d 1504, 1510 (10th Cir. 1994) ("We have repeatedly shown concern with the use of the right to waive counsel as a 'cat and mouse' game with the courts."); United States v. Allen, 895 F.2d 1577, 1578 (10th Cir. 1990) (quoting United States v. McMann, 386 F.2d 611, 618-19 (2d Cir. 1968), for the proposition that a defendant cannot "by ruse or stratagem fraudulently seek to have the trial judge placed in a position where, in moving along the business of the court, the judge appears to be arbitrarily depriving the defendant of counsel"). "In ambiguous situations created by a defendant's vacillation or manipulation, we must ascribe a 'constitutional primacy' to the right to counsel because this right serves both the individual and collective good, as opposed to only the individual interests served by protecting the right of self-representation." Frazier-El, 204 F.3d at 559 (quoting United

States v. Singleton, 107 F.3d 1091, 1102 (4th Cir. 1997)); see generally Martinez v. Court of Appeal of Cal., 120 S. Ct. 684, 691 (2000) ("Even at the trial level, . . . the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.").

Here, the district court made two factual findings relevant to the "clear and unequivocal" requirement. See Hamilton v. Groose, 28 F.3d 859, 862 (8th Cir. 1994) (noting that the question of whether a defendant invoked his right to self-representation in an unequivocal manner is a question of fact). First, it found that the references to Mackovich's interest in representing himself were "vague" and insufficient "to trigger an inquiry into whether [Mackovich] [wa]s attempting to knowingly and voluntarily waive his right to counsel." ROA, Vol. I, Doc. 56 at 2. Second, the district court found that, even assuming the references to self-representation were clear, they were "merely an effort to again delay the trial, and [were] an abuse of the judicial process." Id. at 3.

Without passing on the district court's finding that Mackovich's requests were too vague to trigger an inquiry [5], we conclude the evidence contained in the

_____

[5] Mackovich's *pro se* motion for substitution of counsel clearly indicated an interest in self-representation. However, that motion was never officially filed and there is no indication in the record that it was available to the district court when it issued its November 24, 1998 order. Even assuming, *arguendo*, the motion was available to and reviewed by the district court at some point prior to trial, that does not alter our conclusion that the district court was correct in

(continued...)

20

record on appeal is more than adequate to support the district court's finding that Mackovich's requests for self-representation were merely a tactic for delay. The record in this case reveals that before Mackovich lodged his request for self-representation, he (1) utilized appointed counsel for more than seven months, (2) appeared in court with his attorney on multiple occasions, and (3) sought and received three other continuances. The record also reveals that Mackovich (4) requested leave to represent himself only six to ten days before trial, (5) based his request for self-representation in part on his counsel's refusal to file a variety of frivolous motions (e.g., "Motion for An Identity Hearing, Exculpatory Motions, and Motion for Bail."), (6) coupled his request for self-representation made on the first day of trial with yet another "motion for continuance to prepare," and (7) threatened to "stand mute" and withhold his participation when the district court denied his request. These facts adequately support the district court's finding that Mackovich asserted his right to self-representation in an attempt to delay the trial and abuse the judicial process. Cf. Frazier-El , 204 F.3d at 560 (affirming district court's finding that defendant's request for self-representation was merely a manipulative effort to assert frivolous defenses that defense counsel was unwilling to assert); United States v. George , 56 F.3d 1078, 1084 (9th Cir. 1995)

_____

[5](...continued)
finding that Mackovich's motive for requesting self-representation was to delay the trial.

(affirming a similar finding made by a district court in part because the defendant "sought a continuance in conjunction with his motion to proceed pro se," previously requested additional continuances, and "could and should have brought" his motion for self-representation "earlier than the eve of trial"); Hamilton, 28 F.3d at 862 (concluding that a defendant's "apparent motive" was delay because he waited several months and then requested self-representation on the ground that "he was not prepared for the trial and wanted a continuance to ready his defense"); Robards v. Rees, 789 F.2d 379, 383-84 (6th Cir. 1986) (concluding that granting the request for self-representation, made the day that the trial began, "would have impermissibly delayed the commencement of the trial"). The district court did not err in rejecting Mackovich's request for self-representation when it found the request was made to delay the trial. As Mackovich's requests were made for purposes of delay, they were not in fact unequivocal requests for self-representation.

### III. Sentencing

Mackovich also challenges the district court's application of 18 U.S.C. § 3559(c), popularly known as the "Three Strikes" statute. Specifically, Mackovich argues the district court erred in concluding his 1977 robbery conviction qualified as a "serious violent felony" under § 3559(c), and that the statute's placement of the burden of proof on the defendant to establish by clear

and convincing evidence that the conviction is a nonqualifying felony is unconstitutional.

The statute requires a trial court to "sentence to life in prison any person who is convicted in federal court of a 'serious violent felony' if that person has previously been convicted in state or federal court of two or more 'serious violent felonies.'" United States v. Gottlieb, 140 F.3d 865, 866 (10th Cir. 1998) (quoting § 3559(c)(1)). The offense of robbery is "generally considered a 'serious violent felony' for purposes of the Three Strikes statute." Gottlieb, 140 F.3d at 866 (citing § 3559(c)(2)(F)); see also United States v. Oberle, 136 F.3d 1414, 1423 (10th Cir.) ("The term 'serious violent felony' generally includes robbery under 18 U.S.C. § 2113."), cert. denied, 119 S. Ct. 197 (1998). However, not all serious violent felonies count as "strikes." The statute provides that a crime is a "nonqualifying felony" if the defendant establishes, by clear and convincing evidence, that

> (i) no firearm or other dangerous weapon was used in the offense and no threat of use of a firearm or other dangerous weapon was involved in the offense; and
> (ii) the offense did not result in death or serious bodily injury (as defined in section 1365) to any person.

18 U.S.C. § 3559(c)(3)(A); accord United States v. Romero, 122 F.3d 1334, 1342 (10th Cir. 1997).

At the sentencing hearing in the instant case, the government submitted

23

judgments of conviction indicating that Mackovich previously committed two other robberies in Arizona. These included a conviction for armed robbery in 1982 and a conviction for simple robbery in 1977. The government also submitted offense reports and a written confession relating to the 1977 conviction. Among other things, these documents demonstrated that Mackovich used a firearm to rob a convenience store. Mackovich unsuccessfully objected to the admission of the documents, but did not offer additional proof to rebut them. Rather, Mackovich maintained that under Taylor v. United States, 495 U.S. 575 (1990), the district court was required to limit its consideration to the 1977 judgment of conviction. The district court ruled that Taylor was "not on point," that the 1977 conviction was a "serious violent felony," and that Mackovich failed to show that the 1977 conviction was a "nonqualifying" offense. The court accordingly imposed a sentence of life imprisonment.

A brief discussion of the Taylor decision is in order. The Taylor Court was called upon to determine the meaning of the word "burglary" under 18 U.S.C. § 924(e). 495 U.S. at 577. Section 924(e) provides a sentence enhancement for a defendant who is convicted of unlawfully possessing a firearm "and who has three prior convictions for specified types of offenses, including 'burglary.'" Id. at 578. After reviewing the alternatives, the Supreme Court concluded that "a person has been convicted of burglary for purposes of a § 924(e) enhancement if

24

he is convicted of any crime, regardless of its exact definition or label, having the basic elements of unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." Id. at 599. The Court then addressed "the problem of applying this conclusion to cases in which the state statute under which a defendant is convicted varies from the generic definition of 'burglary.'" Id. The Court held that § 924(e) "mandates a formal categorical approach, looking only to the statutory definitions of the prior offenses, and not to the particular facts underlying those convictions." Id. at 600. The Court's logic was threefold:

> First, the language of § 924(e) generally supports the inference that Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions. . . .

> Second, . . . the legislative history of the enhancement statute shows that Congress generally took a categorical approach to predicate offenses. . . . If Congress had meant to adopt an approach that would require the sentencing court to engage in an elaborate factfinding process regarding the defendant's prior offenses, surely this would have been mentioned somewhere in the legislative history.

> Third, the practical difficulties and potential unfairness of a factual approach are daunting. In all cases where the Government alleges that the defendant's actual conduct would fit the generic definition of burglary, the trial court would have to determine what that conduct was. . . . Also, in cases where the defendant pleaded guilty, there often is no record of the underlying facts. Even if the Government were able to prove those facts, if a guilty plea to a lesser, nonburglary offense was the result of a plea bargain, it would seem unfair to impose a sentence enhancement as if the defendant had pleaded guilty to burglary.

25

Id. at 600-02.

Mackovich's Taylor-based argument proceeds along the following lines: Mackovich "concedes that the government proved by a preponderance that his 1977 conviction of robbery constitutes a serious violent felony for purposes of the Three Strikes statute." Appellant's Opening Brief at 10. However, according to Mackovich the " Taylor categorical approach should apply to the defendant's burden of proving that his offense is a nonqualifying offense." Id. at 11. Mackovich contends that (1) the language of § 3559(c)(3)(A) does not expressly indicate that Congress intended courts to "delve into facts," and the "use of a firearm or threat of such use are often considered elements of crimes," id. at 13; (2) while the legislative history of § 3559(c)(3)(A) "reflects the requirement that a defendant prove that his actions did not constitute the use or threat of use of a firearm," it "does not reveal how Congress intended such proof to be made," id. at 14; and (3) the use of a "factual approach" in this case would be unfair because Mackovich pleaded guilty in 1977 to a simple robbery offense (instead of the armed robbery offense with which he was originally charged) whose elements did not include the use or threat of use of a dangerous weapon. Id. at 14-15. Mackovich further maintains that the age of his 1977 conviction "accentuates th[e] practical difficulties and the potential unfairness of a factual approach." Id. at 15. We review Mackovich's claims de novo. See Gottlieb , 140 F.3d at 868

26

("This court reviews de novo the district court's imposition of a sentence enhancement pursuant to the Three Strikes statute."); see also Oberle, 136 F.3d at 1423 ("We review questions of statutory construction de novo.").

The plain language of § 3559(c)(3)(A) forecloses Mackovich's position. As we explained in Romero, "[i]n interpreting a statute, we begin with the plain language of the statute itself. If the terms of the statute are unambiguous, our inquiry ends." 122 F.3d at 1337 (citation omitted). Section 3559(c)(3)(A) provides that a prior robbery does not qualify as a "strike" if the defendant clearly and convincingly establishes that "no firearm or other dangerous weapon was used in the offense," "no threat of use of a firearm or other dangerous weapon was involved in the offense," and "the offense did not result in death or serious bodily injury" to any person. This language unmistakably requires courts to look to the specific facts underlying the prior offense, not to the elements of the statute under which the defendant was convicted. In contrast, § 924(e) – the statute at issue in Taylor – explicitly and implicitly directs courts to examine the elements of a defendant's previous crimes. See 18 U.S.C. § 924(e)(2)(B)(i) (stating that the term "violent felony" means an offense "punishable by imprisonment for a term exceeding one year" that "has as an element the use, attempted use, or threatened use of physical force against the person of another"); 18 U.S.C. § 924(e)(2)(B)(ii) (stating that the term "violent felony" likewise includes

27

burglary, arson, extortion, the use of explosives, and other conduct presenting "a serious potential risk of physical injury to another"). As a result, Taylor's categorical approach is inapplicable to the "nonqualification" inquiry under § 3559(c)(3)(A), and cannot provide a basis for reversal in this case.

Mackovich's final argument is that § 3559(c)(3)(A) is unconstitutional. Citing Cooper v. Oklahoma, 517 U.S. 348 (1996) and United States v. Gatewood, 184 F.3d 550 (6th Cir. 1999), vacated for rehearing en banc, No. 98-5138, 1999 WL 1482026, at *1 (6th Cir. Oct. 28, 1999), he contends that the "clear and convincing" burden of proof imposed by § 3559(c)(3)(A) is inconsistent with the Due Process Clause. Mackovich thus urges that "his burden was only to show . . . by a preponderance of the evidence that his 1977 conviction was a nonqualifying felony and could not be used as a third strike." Appellant's Opening Brief at 17. According to Mackovich, he shouldered this burden by submitting as evidence "the pertinent Arizona statute and the judgment and commitment order." Appellant's Reply Brief at 1. Neither of these documents mentioned the use, threat of use, or involvement of a dangerous weapon.

We need not address Mackovich's due process challenge to § 3559(c)(3)(A), because his argument fails on other grounds. As the district court recognized, Mackovich did not muster "even a preponderance of the evidence that he did not use a weapon" in the commission of the 1977 robbery.

ROA, Vol. VI, at 578. Through the offense reports and other documents, the government conclusively established that Mackovich used or threatened to use a dangerous weapon. Consequently, even if we assume that the burden of proof under § 3559(c)(3)(A) should be a preponderance, Mackovich's proffered evidence failed to satisfy that standard – a point Mackovich acknowledges in his appellate brief. See Appellant's Reply Brief at 5 ("If this court finds that the categorical approach of Taylor does not apply to the defendant's burden of proving his prior serious violent felony is a nonqualifying felony, then of course, Mackovich did not meet his burden."). Indeed, Mackovich's argument fails even if we assume that the proper interpretation of § 3559(c)(3)(A) requires the government to prove by a preponderance of the evidence that a dangerous weapon was involved in a prior offense. For that reason, we affirm the district court while reserving judgment on the constitutionality of the "clear and convincing evidence" provision of § 3559(c)(3)(A). See United States v. Smith, ___ F.3d ___, 2000 WL 345683 at *3 (10th Cir. 2000) (avoiding a challenge to the "clear and convincing evidence" provision of § 3559(c)(3)(A) because, "[u]nder any standard of proof, defendant [could not] establish that he [wa]s exempt from the three strikes enhancement"); United States v. Kaluna, 192 F.3d 1188, 1196 (9th Cir. 1999) (same); cf. Gottlieb, 140 F.3d at 873 n.11 (declining to decide whether the "clear and convincing evidence" provision violates the Due Process Clause

29

because the defendant "satisfied this heightened standard").

AFFIRMED.