**UNITED STATES of America,**

v.

**Victor Darnell THOMAS, Defendant.**

**No. 01–CR–5 J.**

United States District Court,
W.D. Pennsylvania.

April 19, 2002.

John J. Valkovci, Jr., Johnstown, PA, for the United States of America.

Victor Darnell Thomas, Hollidaysburg, PA, pro se.

Marketa Sims, Fed. Public Defender's Office, Pittsburgh, PA, William H. Difenderfer, Pittsburgh, PA, Bruce A. Antkowiak, New Kensington, PA, Russell J. Heiple, Johnstown, PA, Arthur T. McQuillan, Gleason, DiFrancesco, Shahade, Barbin, McQuillan & Markovitz, Johnstown, PA, for Defendant.

## MEMORANDUM OPINION

D. BROOKS SMITH, Chief Judge.

### UNDER SEAL*

I write, yet again, with regard to a request from counsel for defendant Victor Darnell Thomas to withdraw from this case. Because the procedural history of this matter, and especially the sequence of attorneys who have appeared on Thomas' behalf, is relevant to my resolution of the pending motion, I will begin by recounting the relevant events.[1]

---

\* This Memorandum Opinion was unsealed by an order dated September 10, 2002.

1. Some of this procedural history has already been summarized in my previous memorandum opinion regarding the withdrawal of Bruce Antkowiak as counsel for Thomas. *See* dkt. no. 55. Because it is again relevant, I repeat this information.

## I.

On May 16, 2001, an indictment, charging the defendant with violations of the Controlled Substances Act, 21 U.S.C. § 841(a)(1) and (b)(1)(C), was returned by a grand jury sitting in the Johnstown Division of the Western District of Pennsylvania. Dkt. no. 1. On June 4, William H. Difenderfer, Esquire, entered his appearance for defendant. Dkt. no. 7. At the end of June, Attorney Difenderfer moved to withdraw, citing the defendant's failure to pay the quoted fee despite Attorney Difenderfer's representation of the defendant at the initial appearance and detention hearing. Dkt. no. 14. Thomas opposed Attorney Difenderfer's motion. In his opposition, defendant "questioned" his counsel's "professionalism and Federal experience" and expressed his belief, contrary to that of Attorney Difenderfer, that it would have been better "to waive the detainment hearing." Dkt. no. 15. By order dated July 5, I granted the motion to withdraw and directed the completion by the defendant of a CJA 23 financial affidavit or the filing of an entry of appearance by July 16, 2001. Dkt. no. 16.

Thomas filed a motion to change venue and a motion for recusal on July 16. Dkt. nos. 18, 19. The motion for recusal was denied as frivolous and defendant was again directed to complete the CJA 23 financial affidavit form. Dkt. no. 20. The order specified, in bold text, that "[f]ailure to return the CJA 23 affidavit shall be deemed as a request to represent himself, *i.e.*, to proceed *pro se*, in this criminal action." Dkt. no. 20. A CJA 23 affidavit was subsequently filed and Assistant Federal Public Defender Marketa Sims was appointed as counsel on July 17, 2001. Dkt. nos. 21, 22. In mid-September, Attorney Sims filed motions to reveal the identity of the confidential informant, to suppress evidence, and to produce evidence. Dkt. nos. 28–30. A subsequent request by defense counsel for a subpoena was granted and the defense filed a motion to weigh and test the controlled substances. Dkt. nos. 33, 35.

Thomas' motion to reveal the identity of the confidential informant was denied in mid-October and a hearing on his motion to suppress was held on October 19. Dkt. nos. 37, 38. In a decision dated October 25, I denied defendant's motion to suppress evidence and to produce evidence. Dkt. no. 39. On November 16, defense counsel filed what she styled a "motion to determine representation as counsel." Dkt. no. 42. Several days later, Attorney Sims moved to withdraw as counsel.

During a hearing on November 26, I advised Thomas that Attorney Sims was a very experienced and highly-skilled criminal defense lawyer. He continued to press for new counsel, however, and I granted Attorney Sims' motion to withdraw. Dkt. no. 45. Shortly thereafter, Attorney Bruce Antkowiak was appointed to represent Thomas.

Attorney Antkowiak moved for a continuance of the scheduled trial, and that motion was granted. By order dated December 19, 2001, trial was scheduled for March 18, 2002. Dkt. no. 48. Thereafter, Attorney Antkowiak obtained leave to hire an investigator. But, on January 28, 2002, Attorney Antkowiak moved to withdraw as counsel, apparently because of a breakdown in communication with Thomas. Dkt. no. 50. During a hearing conducted on February 6, Attorney Antkowiak advised this court that he "could not, given the relationship . . . fulfill a function consistent with the constitutional standard" of effective assistance of counsel. Dkt. no. 53, at 8. Mindful of the attorney client privilege, Attorney Antkowiak stated that his motion was not precipitated by a

> single instance of a . . . disagreement on a matter of strategies. It is a matter which has preceded from . . . I believe

considerations on [defendant's] part of a lack of trust of me and proceeding to one or more acrimonious exchanges; and finally, a ... termination of a willingness to speak and discuss matters critical to the case between the two of us.

*Id.* at 8. Counsel affirmed that he did not believe that Thomas was being intentionally dilatory. He affirmed, however, that the attorney-client relationship was "irreparably broken[.]" *Id.* at 9.

Thomas confirmed that it was "a mutual thing" and stated that he "can't be held accountable for this attorney or the last attorney that we just can't get along. And I'm not saying that I won't get along with all my attorneys and I would ask for the Court to appoint me another attorney[.]" Dkt. no. 53, at 13. I acknowledged Thomas' request and advised him that there was "no guarantee" he was "going to get another attorney." *Id.* Hypothetically, I inquired whether he would desire standby counsel, if it should be determined that the Constitution did not require the appointment of another attorney. Standby counsel, Thomas was advised, would be able "to assist" him while he would be "in charge of the proceedings." *Id.* at 16.

Instead of directly answering the question, Thomas asserted that he would be disadvantaged because the prison library was inadequate. *Id.* I advised Thomas that he would not be transferred to another facility on that basis and that standby counsel would be available to assist with legal research. Thomas then explained that he had "problems with my legal counsel giving me that type of information ... when I requested it ... they wouldn't provide [it]." Dkt. no. 53, at 17. I explained that a "lawyer's obligations do not stretch to sharing with you every bit of his work product or her work product." *Id.* at 18. He responded that he wanted to "have a little bit of input as to certain motions

being filed" and complained that "certain motions were filed without even my knowledge and motions that I asked to be filed were not filed." *Id.* I then informed Thomas that a lawyer is not obligated "to file every motion that a client asks to be filed[,]" *id.*, and that a "lawyer is not there simply to respond to every request for various forms of legal relief[.]" *Id.* at 19. Based on Thomas' conduct and his representations to the court, I concluded that Attorney Antkowiak should be granted leave to withdraw. *See* dkt. no. 55. I also found at that time, however, that the rupture in the attorney-client relationship between Thomas and Attorney Antkowiak was partly "the product of the defendant's unreasonable expectations regarding the role of his attorney and the defendant's refusal to cooperate with counsel when those expectations are not fulfilled." *Id.* at 4. Nonetheless, the Sixth Amendment required that Thomas be appointed new counsel, and I appointed Attorney Arthur McQuillen to represent him. *See id.* at 8.

 Given Thomas' history of failed relationships with defense counsel, however, my order granting Attorney Antkowiak leave to withdraw and appointing Attorney McQuillen in his stead explained that a defendant can, under certain circumstances, be deemed to have forfeited or waived his Sixth Amendment right based upon his conduct. Although forfeiture and waiver of the right to counsel are sometimes confused, the Third Circuit has clearly distinguished these two concepts. *See United States v. Goldberg,* 67 F.3d 1092, 1100 (3d Cir.1995). A forfeiture of the Sixth Amendment right to counsel can occur only after extreme misconduct by a defendant. For example, in *United States v. Leggett,* 162 F.3d 237, 250 (3d Cir.1998), a defendant physically assaulted his counsel in the courtroom, and the court found that this outrageous misconduct resulted

in the forfeiture of his Sixth Amendment right. Waiver by conduct differs in that it follows not extreme misconduct but rather dilatory tactics about which the defendant has been warned. *See Goldberg,* 67 F.3d at 1100. As long as the defendant has been advised of the consequences of his action, waiver of the Sixth Amendment right by conduct can be found even where defendants "vehemently object to being forced to proceed *pro se.*" *Id.* at 1101. Because Thomas had not been unequivocally warned that his refusal to cooperate with defense counsel would result in the waiver of his Sixth Amendment right, I determined that the appointment of Attorney McQuillen was necessary to protect Thomas' constitutional rights. *See* dkt. no. 55, at 7–8.

■ The Third Circuit requires a searching inquiry before any finding that a defendant has knowingly and voluntarily waived his right to counsel. *See United States v. Welty,* 674 F.2d 185, 189 (3d Cir.1982). I therefore ordered Thomas to appear in court on February 19, 2002. *See* dkt. no. 55, at 8. At that proceeding, I engaged Thomas in a long colloquy regarding his Sixth Amendment right, and I set forth some guidelines as to what Thomas could reasonably expect from his professional relationship with court-appointed defense counsel. *See* dkt. no. 61, at 5. (transcript of proceedings for Feb. 19, 2002). Specifically, I informed Thomas that he was not entitled to an attorney who agreed with his personal view of the law or the equities of the prosecution's case. *See id.* at 6. I also advised Thomas that defense counsel was "not required to docilely and without question do whatever it is you [Thomas] tell him to do." *Id.* at 7. In addition, I instructed Thomas that reasonable communication between attorney and client was a bilateral obligation. *See id.* at 7.

With respect to the possibility of a waiver by conduct of his Sixth Amendment right to counsel, Thomas initially told me that he did not understand that possibility. *See id.* at 7. At this point, I halted the colloquy, reiterated the guidelines I had already stated, but paused to discuss the meaning of the word "unreasonable" as I had used it in relation to a defendant's expectations of his defense counsel. *See id.* at 8–9. Following this further explanation, Thomas asked if I was drawing a legal conclusion about the previous withdrawals of his attorneys. *See id.* at 9. I explained that I was drawing no conclusions, that I was simply "making sure you [Thomas] understand the implications here. You see it is the repetitive appointment of counsel and discharge of counsel that causes this question to be raised under the law, so it's necessary that I explain it to you." *Id.* Thomas stated that he understood that point. *See id.* at 10. I reiterated that I was talking about only a possible situation in which Thomas' disagreements with counsel were found to be unreasonable, such that they constituted misconduct and a waiver by conduct of his right to counsel. *See id.* Finally, I asked the following questions:

> [S]o do you understand now—after my effort to re-explain this principle? That if you have a case where there have been repetitive terminations of counsel and the Court can conclude that there is misconduct on the part of a client/defendant then that misconduct may be construed as a waiver of this 6th Amendment right to counsel with the implication being then that you would have to represent yourself?

*Id.* at 10–11. In response to this question, Thomas answered, "Yes, Your Honor." *Id.* at 11.

Following this part of the colloquy, I proceeded to remind Thomas of the nature of the charges pending against him and

the possible penalties that attached to those charges. *See id.* at 11–15. Next, I explained that, if he were found to have waived by conduct his right to counsel and were then to represent himself, he would face some substantial obstacles. *See id.* at 15. Among other things, if Thomas were to proceed *pro se,* he would need to comply with the Federal Rules of Evidence and Procedure, his defense might be undermined by his lack of legal knowledge and training, that the government attorneys were experienced litigators, and most importantly, that he could be handicapped by being placed in the dual role of advocate and defendant. *See id.* at 15–16. At all points, Thomas stated that he understood my warnings. *See generally, id.* At the end of this hearing, at which Attorney McQuillen was present, I introduced Thomas to his new defense counsel.

Attorney McQuillen subsequently moved for a continuance, and trial was postponed until May 13, 2002. *See* dkt. no. 59. I appointed an investigator to assist Thomas, *see* dkt. no. 60, and it appeared that the defense was preparing for trial.

On April 15, 2002, however, Attorney McQuillen filed a motion to withdraw as counsel for Thomas. *See* dkt. no. 65. I immediately arranged for a hearing on this matter, to take place on April 17, 2002. I began the hearing by clarifying whether Thomas had requested that Attorney McQuillen withdraw from representation. The motion to withdraw stated twice that

Thomas had specifically requested that McQuillen do so, but Thomas denied that he made such a request, although he had no objection to McQuillen's withdrawing. At this point, I recognized that any further inquiry into this matter might implicate the attorney-client privilege, and Attorney McQuillen confirmed that this was a "distinct possibility." Without objection from Assistant United States Attorney John Valkovci, the government's attorneys and agents withdrew and I closed the courtroom to continue the hearing *ex parte.*[2]

The following constitute my findings of fact from the April 17, 2002 hearing. Attorney McQuillen has diligently carried out his representation of Thomas, but theirs was an acrimonious professional relationship. *See* Transcript at 10.[3] McQuillen requested that Thomas prepare a written list of potential witnesses and a written narrative of the relevant facts, but Thomas refused to do so because he believed such information was already available in files McQuillen had received from Thomas' previous attorneys. McQuillen showed Thomas the files in question, in which no such information was contained, but Thomas still did not cooperate with McQuillen's requests for information. *See id.* at 28. Instead, Thomas requested that McQuillen file a supplemental motion to suppress evidence,[4] research the Interstate Agreement on Detainers Act, and assist with the state criminal proceedings against him. *See id.* at 15, 27. McQuillen explained that there were no legal bases for pursuing some of

---

**2.** Because privileged information may be implicated by my discussion and analysis of this matter, I will file this opinion under seal so that its contents cannot in any way prejudice Thomas' defense at trial.

**3.** The court reporter has provided me with a preliminary copy of the transcript of the proceedings on April 17, 2002. In order to protect privileged and confidential information discussed during the *ex parte* portion of the hearing, the final transcript will be filed un-

der seal. The transcript has not yet been filed, however, so I will refer to it simply as "Transcript."

**4.** I had previously denied Thomas' motion to suppress evidence, which had been ably advocated by Marketa Sims. *See* dkt. no. 39. Thomas asked McQuillen if Sims' representation had been constitutionally ineffective. McQuillen stated that he didn't think so, but that would not preclude a possible appeal on issues related to the suppression motion.

the tactics Thomas suggested; furthermore, McQuillen explained that his representation of Thomas was limited to the federal criminal prosecution for which he had been appointed. *See id.* at 27. In many instances, Thomas asked McQuillen to document his conclusions that certain motions were without merit. *See id.* at 20, 21, 25. It is unclear how and to what extent McQuillen may have complied with these requests, but McQuillen may have told Thomas that he did not need to document his conclusions because it was not necessary to do so. *See id.* at 26.

Things apparently came to a head on April 9, 2002. McQuillen and the court-appointed investigator went to the Cambria County prison to see Thomas. *See id.* at 10. McQuillen had previously sent Thomas a letter explaining the various sentences that might apply to this case, and at the prison, he asked that Thomas sign a copy of this letter to acknowledge that he had received McQuillen's explanation of the gravity of the charges against him. *See id.* at 16. Instead, Thomas tore up the letter. *See id.* A bitter argument ensued, with McQuillen and Thomas yelling at each other, until Thomas threatened McQuillen with a "physical confrontation." *See id.* at 17. McQuillen memorialized this confrontation in a letter dated April 10, 2002.[5] After he received this letter, Thomas made a collect call to McQuillen. Apparently, during the course of this conversation, Thomas asked McQuillen to come to the Cambria County prison, and when McQuillen said that a visit wasn't necessary at that time, Thomas said, "Why don't you just withdraw from the case?" and slammed down the phone. *See id.* at 9. Following this exchange, McQuillen filed his motion to withdraw. Although McQuillen and Thomas appear to have agreed on the overall defense theory of the case, their attorney-client relationship has deteriorated to the point that McQuillen can no longer effectively represent Thomas.

As I noted at the conclusion of the hearing, two issues remain for me to consider. First, in light of Thomas' history of firing or alienating the attorneys who have represented him in this case, has Thomas forfeited or waived by conduct his Sixth Amendment right to an attorney? Assuming that the first question is answered in the affirmative, the remaining issue is whether I should appoint standby counsel to assist Thomas at trial, and if so, whom to appoint.

## II.

Given the history of this case and Thomas' repeated inability or refusal to cooperate with the knowledgeable and experienced attorneys who have represented him, I will not appoint another attorney to represent him in this matter. I reach this conclusion for two reasons. In light of Third Circuit precedent governing the forfeiture of the Sixth Amendment right, Thomas' threat of a physical confrontation with Attorney McQuillen amounts to the kind of outrageous conduct that requires forfeiture of the right to counsel. *See Leggett,* 162 F.3d at 250. But even if Thomas had not forfeited his Sixth Amendment right by threatening Attorney McQuillen, this record demonstrates that Thomas has waived his right to counsel by his conduct. *See Goldberg,* 67 F.3d at 1100–01.

### A.

■ Forfeiture of the Sixth Amendment right is the converse of the intentional relinquishment of the right that the Supreme Court approved in *Faretta v. Cali-*

---

5. A copy of this letter has been filed under seal as an exhibit to the standard hearing memorandum for the April 17, 2002 hearing.

*fornia,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Unlike an intentional waiver, "forfeiture results in the loss of a right regardless of the defendant's knowledge thereof and irrespective of whether the defendant intended to relinquish the right." *Goldberg,* 67 F.3d at 1100; *see also United States v. Leggett,* 162 F.3d 237, 250 (3d Cir.1998). In *Goldberg,* the Third Circuit cited *United States v. McLeod,* 53 F.3d 322 (11th Cir.1995) as an example of a defendant's forfeiture of the right to counsel. In that case, defense counsel cited the defendant's abusive conduct, threats to sue counsel, and demands that counsel engage in unethical conduct as reasons for requesting withdrawal, and the Eleventh Circuit noted that "a defendant who is abusive toward his attorney may forfeit his right to counsel." *Id.* at 322. According to the *Goldberg* court, forfeiture requires "extremely serious misconduct," *Goldberg,* 67 F.3d at 1102, but it does not require any prior warnings about the consequences of misconduct or the risks of proceeding *pro se,* as required by *Faretta* or *Welty. See id.* at 1101. More recently, the Third Circuit has found a forfeiture of the right to counsel where a

defendant physically assaulted his defense counsel in court. *See Leggett,* 162 F.3d at 250 ("We do not hesitate to conclude that such an attack qualifies as the sort of 'extremely serious misconduct' that amounts to the forfeiture of the right to counsel.") (citation omitted).

 This case does not involve misconduct as extreme as that in *Leggett,* but I think that there has been "extremely serious misconduct" nonetheless. At his meeting with Attorney McQuillen on April 9, 2002, Thomas threatened to physically assault McQuillen. In the course of a heated argument, Thomas stated "the matter may culminate in a physical confrontation." [6] Transcript at 17. I do not hesitate to conclude that this statement constituted a threat that Thomas would physically attack Attorney McQuillen.[7] To be sure, the threat of a physical attack is less extreme than the actual assault that occurred in *Leggett,* but it is still serious enough to constitute a forfeiture of Thomas' right to counsel. In *Goldberg,* the court treated the defendant's threat on the life of his defense attorney as a possible forfeiture of the Sixth Amendment right; [8]

**6.** Thomas admits to making this statement, though perhaps not in the exact words quoted above. *See* Transcript at 21

**7.** Thomas denies that his statement was a physical threat against McQuillen. *See* Transcript at 21. I cannot credit Thomas statement. His statement to McQuillen may be reasonably interpreted as a threat, and McQuillen understood it to be a threat. Based upon my assessments of the credibility of McQuillen and Thomas, I conclude that Thomas' statement conveyed a physical threat against McQuillen.

**8.** It is true that the *Goldberg* court concluded that the defendant had not forfeited his Sixth Amendment right in that case, *see* 67 F.3d at 1102, but the instant case is distinguishable for two reasons. First, *Goldberg* rejected the district court's finding of a forfeiture of the right to counsel because the district court had

based its finding on an *ex parte* and *post hoc* evidentiary hearing. *See id.* ("we believe that on the facts of this case an *ex parte* hearing where the defendant's interests were not represented cannot be used to justify a *post hoc* forfeiture argument"); *see also Leggett,* 162 F.3d at 250 ("we reversed the district court's ruling [in *Goldberg* ] because its factual findings concerning the death threat were made in a hearing to which the defendant was not a party"). In the instant case, my factual finding that Thomas threatened Attorney McQuillen with a physical confrontation is based upon the factual record developed at a hearing in which Thomas was himself an active participant.

Second, the court in *Goldberg* observed that "we have never explicitly adopted a pure forfeiture analysis in this Circuit." *Goldberg,* 67 F.3d at 1102. Since *Goldberg,* however, the Third Circuit's decision in *Leggett* has adopted such a pure forfeiture analysis. *See Leggett,*

Thomas' threat against McQuillen is similar to the threat in *Goldberg*. It is true that Thomas did not specifically threaten the life of Attorney McQuillen, as did the defendant in *Goldberg,* but Thomas' threat of physical violence is still extremely outrageous. Our adversarial system of justice requires the cooperation of defense counsel with the defendant, but that cooperation is limited by the rules of law and of professional responsibility. Any threat of physical violence by a defendant against his lawyer jeopardizes the judicial apparatus for the peaceful resolution of legal disputes. Such threats cannot be countenanced. Thomas' threat of violence against attorney McQuillen is surely "extremely outrageous misconduct," and it is sufficient to find a forfeiture of Thomas' Sixth Amendment right to counsel.

My conclusion could stand solely on this single incident of a violent threat, but it is bolstered by the fact that this is not the first time Thomas has abused his professional relationships with his defense counsel. Attorney McQuillen is the *fourth* defense lawyer to represent Thomas in this case. The previous two court-appointed counsel withdrew from their representations of Thomas because of his unreasonable demands upon counsel, because of his refusal to cooperate with counsel or even communicate with counsel, and because of the complete deterioration of the attorney-client relationship. *See* dkt. nos. 43, 50. Thomas' pattern of misconduct with regard to defense counsel is transparent. Because that pattern of misconduct has now risen to the level of a physical threat against a defense lawyer, I have no choice but to find that Thomas' has acted in an "extremely outrageous" manner that effectively forfeits his Sixth Amendment right.

162 F.3d at 251 ("we conclude that ... Leg-

## B.

 Even if it were determined that the record did not support the pure forfeiture analysis above, the record also compels the conclusion that Thomas has waived by conduct his right to counsel. *See Goldberg,* 67 F.3d at 1100–01 (explaining waiver by conduct). The decision to waive one's right to counsel and to exercise the right to self-representation, however, "must be knowing, voluntary and intelligent." *Id.* at 1099 (citing *Johnson v. Zerbst,* 304 U.S. 458, 464–65, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)); *see also Faretta,* 422 U.S. at 835, 95 S.Ct. 2525. Thus, as "a constitutional prerequisite to a valid waiver of the right to counsel," a trial court must conduct a "*Faretta*-type inquiry before permitting a defendant who asks to represent himself to do so." *Goldberg,* 67 F.3d at 1099. Under Third Circuit precedents, the "*Faretta*-type inquiry" should resemble the following:

> In order to ensure that a defendant truly appreciates the "dangers and disadvantages of self-representation," the district court should advise him in unequivocal terms both of the technical problems he may encounter in acting as his own attorney and of the risks he takes if his defense efforts are unsuccessful. The district court judge should tell the defendant, for example, that he will have to conduct his defense in accordance with the Federal Rules of Evidence and Criminal Procedure, rules with which he may not be familiar; that the defendant may be hampered in presenting his best defense by his lack of knowledge of the law; and that the effectiveness of his defense may well be diminished by his dual role as attorney and accused. In addition ...

> [t]o be valid [a defendant's] waiver must be made with an apprehension of

gett forfeited his right to counsel").

the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.

*Welty,* 674 F.2d at 188–89 (quoting *Von Moltke v. Gillies,* 332 U.S. 708, 724, 68 S.Ct. 316, 92 L.Ed. 309 (1948) (plurality)). A waiver of the right to counsel does not require a "detailed listing of advice similar to that mandated for guilty plea proceedings conducted pursuant to Rule 11." *Welty,* 674 F.2d at 189. But it does require a searching inquiry by the district court to determine that the "defendant's waiver was understanding and voluntary." *Id.* at 189.

■ In the case of a waiver by conduct, additional warnings are required. The defendant must be "warned about the consequences of his conduct, including the risks of proceeding *pro se.*" *Goldberg,* 67 F.3d at 1100–01. "Once a defendant has been warned that he will lose his attorney ..., any misconduct thereafter may be treated as an implied request to proceed *pro se* and thus, as a waiver of the right to counsel." *Id.* 1100. The decision to deprive a defendant of this fundamental right may be made "regardless of whether the defendant affirmatively wishes to part with that right" as long as the defendant has been advised of the consequences of his actions. *Id.* at 1101 (recognizing the possibility of waiver by conduct even in situations where

defendants "vehemently object to being forced to proceed *pro se* ").

The Third Circuit is not alone in recognizing that a defendant may effect a waiver by conduct of his Sixth Amendment right to counsel. In *United States v. Fazzini,* 871 F.2d 635, 642 (7th Cir.1989), the Seventh Circuit declared that

it is not necessary that a defendant verbally waive his right to counsel; so long as the district court has given the defendant sufficient opportunity to retain the assistance of appointed counsel, defendant's actions which have the effect of depriving himself of appointed counsel will establish a knowing and intentional choice.

*Id.* There, the court agreed that the defendant, despite his repeated requests for another court-appointed attorney, had knowingly and intelligently waived his right to appointed counsel when he refused to cooperate with his fourth court-appointed attorney after being warned of the consequences that his failure to cooperate would have. Likewise, in *United States v. Moore,* 706 F.2d 538 (5th Cir.1983), the Fifth Circuit concluded that a "persistent, *unreasonable* demand for dismissal of counsel and appointment of new counsel ... is the functional equivalent of a knowing and voluntary waiver of counsel. In such an instance the trial court may proceed to trial with the defendant representing himself." *Id.* at 540 (emphasis added).[9] The *Moore* case is instructive because the Fifth Circuit explained that

---

**9.** *See also United States v. Irorere,* 228 F.3d 816, 827–28 (7th Cir.2000) (District Court's finding that defendant knowingly and intelligently waived his right to counsel was not an abuse of discretion in light of defendant's refusal to cooperate with four court-appointed attorneys and the fact that he had been advised of the consequences of his refusal to cooperate); *United States v. Gangler,* 125 F.3d

856 (Table), 1997 WL 618783 (6th Cir. Oct.6, 1997) (defendant waived right to counsel at sentencing by accusing his court-appointed attorneys of conspiring with the government); *United States v. Harris,* 2 F.3d 1452, 1454–55 (7th Cir.1993) (defendant discharged fourth attorney after being warned that he would not receive another court-appointed counsel).

A defendant is entitled to counsel capable of rendering competent, meaningful assistance in the preparation and trial of the pending charges, including appropriate evaluation and advice with reference to a plea of guilty. A defendant is not entitled to an attorney who agrees with the defendant's personal view of the prevailing law or the equities of the prosecutor's case. A defendant is entitled to an attorney who will consider the defendant's views and seek to accommodate all reasonable requests with respect to trial preparation and trial tactics. A defendant is entitled to appointment of an attorney with whom he can communicate reasonably, but has no right to an attorney who will docilely do as he is told.

*Id.; see also Vega v. Johnson,* 149 F.3d 354, 361 (5th Cir.1998) (observing that a defendant may not "force his attorney to present a defense with which the attorney does not agree or acquire new court-appointed counsel until he finds an attorney who agrees with him").

When Thomas' previous defense counsel, Attorney Antkowiak, filed his motion to withdraw, I believed that Thomas might be engaging in dilatory tactics to delay trial. For that reason, at the time I appointed Attorney McQuillen to represent Thomas, I held a hearing at which I warned Thomas that his refusal to cooperate with defense counsel would result in the waiver of his Sixth Amendment right. *See* dkt. no. 61. As I explained above, *supra* Part I, I unequivocally warned Thomas of the difficulties he would face if he proceeded *pro se*, the procedural requirements with which he would have to comply, the nature of the charges against him, and the possible range of punishments that could be imposed upon him. *See generally id.* More importantly, I explained that he could not make unreasonable demands upon his defense counsel, *see id.* at 8–9, and that if he continued to do so, or other-

wise refused to cooperate reasonably with his court-appointed counsel, I would treat his conduct as an implied request to proceed *pro se. See id.* at 10–11. Most importantly, Thomas told me at the hearing on February 19, 2002, that he understood the possibility that his Sixth Amendment right to counsel could be waived by his conduct. *See id.* at 11. Thomas further reiterated his understanding of that possibility at the most recent hearing held on April 17, 2002. *See* Transcript at 14 (Thomas acknowledging that "if there's a conflict on my part, that this Court does not have to appoint me a further court-appointed counsel"). Furthermore, I sent a copy of my earlier opinion discussing the possibility of a waiver by conduct to Thomas at the Cambria County Prison. *See* dkt. no. 55 at 8–9. Thomas is an articulate and well-spoken young man who can read and write. Because of my written opinion on this issue, together with the exhaustive colloquy which Thomas has indicated that he understood, there can be no doubt that Thomas understood what was at stake when he decided whether or not to cooperate with his defense counsel in a reasonable manner.

Thomas has refused to cooperate in such a reasonable manner. The current rupture in Thomas' attorney-client relationship with McQuillen is exactly the kind of misconduct that I warned him could constitute a waiver by conduct of his Sixth Amendment right to counsel. Thomas and Attorney McQuillen apparently agree on the defense's theory of the case, and McQuillen has diligently prepared to mount that defense at trial. Yet Thomas has refused to cooperate; he has not supplied McQuillen with the written narrative that McQuillen requested, even after McQuillen showed Thomas that a similar written statement was not available in the file. Thomas has also refused to supply McQuillen with a list of potential defense

witnesses. In general, Thomas appears to have behaved unreasonably throughout his interactions with Attorney McQuillen. For example, Thomas complained that Attorney McQuillen spent more time talking to prosecutor John Valkovci than he did talking with the defendant. *See* Transcript at 23. Yet Thomas said that he understood how important it was for defense counsel to confer with the prosecution, both for discovery and possible plea negotiations. *See id.* Despite Thomas' comprehension of the importance of McQuillen's discussions with Valkovci, he nevertheless complained to McQuillen about them. This verbal abuse is exactly the sort of unreasonable misconduct about which I have previously warned Thomas.

Furthermore, while Thomas has refused to cooperate with Attorney McQuillen's reasonable requests, Thomas has always made several unreasonable demands of his own. For example, Thomas has requested that McQuillen assist in the defense of the pending state charges, even though McQuillen has explained to him that he was appointed to represent him only in connection with the pending federal charges. Similarly, Thomas asked Attorney McQuillen to pursue a supplemental suppression motion, even though McQuillen had concluded that such a motion would be without legal basis. Whenever McQuillen rejected a legal strategy or tactic that Thomas suggested, Thomas apparently demanded that McQuillen document all of his legal conclusions. As Thomas continued to make unreasonable demands upon his defense counsel, his relationship with Attorney McQuillen became more acrimonious, to the point that Thomas threatened McQuillen with a physical confrontation. Following this threat, McQuillen concluded that he could no longer provide Thomas with effective representation.

Based upon my review of the record that has been developed in this case, the cur-

rent rupture in the attorney-client relationship has its origin in one source only: Thomas' own misconduct in repeatedly refusing to cooperate with counsel and ultimately threatening his counsel with physical assault. Thomas has been duly warned of the consequences of such misconduct. Thomas' repeated refusals to cooperate with counsel in a reasonable manner can be interpreted only one way: as a request to represent himself at trial, with full knowledge of the risks and difficulties he will confront *pro se.* Even if his threat against Attorney McQuillen has not forfeited his Sixth Amendment right to counsel, I find that Thomas has waived that right by his own conduct. A fifth attorney will not be appointed to represent him.

### III.

 Having concluded that Thomas has either forfeited or waived his Sixth Amendment right to counsel, I now confront the remaining issues I identified at the conclusion of the April 17, 2002 hearing: should I appoint standby counsel, and if so, whom? The decision to appoint standby counsel is vested in the district court's discretion, and the wishes of the defendant carry no weight. *See McKaskle v. Wiggins,* 465 U.S. 168, 184, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) ("A defendant's Sixth Amendment rights are not violated when a trial judge appoints standby counsel—even over the defendant's objection"). The appointment of standby counsel can "relieve the judge of the need to explain and enforce basic rules of courtroom protocol or to assist the defendant in overcoming routine obstacles that stand in the way of the defendant's achievement of his own clearly indicated goals." *Id.* I think the procedural advantages of having standby counsel present to assist Thomas with his *pro se* defense warrant the appointment of standby counsel for this case. In addition, standby counsel will be available at trial to take over the defense should Thomas be

unable or unwilling to proceed *pro se*. This further supports my conclusion that standby counsel should be appointed to assist Thomas in his *pro se* defense.

I would very much like to appoint Attorney McQuillen to serve as Thomas' standby counsel; McQuillen is already familiar with the case (which is scheduled for trial on May 13, 2002), and he has explained that he and Thomas agree on the defense's theory of the case. At the April 17, 2002 hearing, however, when I inquired of Attorney McQuillen's ability to serve as standby counsel, he explained that the attorney-client relationship can be pushed only to a certain limit, and he feared that his professional relationship with Thomas was already beyond that limit. *See* Transcript at 30. Accordingly, he did not believe he would be able to render effective assistance to Thomas, even in the capacity of standby counsel. *See id.* Based on Attorney McQuillen's representations, I cannot now appoint him to act as Thomas' standby counsel.

I will undertake the administrative steps necessary to appoint another attorney to serve as standby counsel for Thomas. My expectation is that standby counsel can be appointed expeditiously. Because the appointed attorney will not principally be responsible for presenting Thomas' defense at trial, but instead will serve to advise Thomas during the *pro se* defense, I do not expect that the late appointment of standby counsel will necessitate still another continuance of the trial scheduled for May 13, 2002.

### IV.

I take very seriously my constitutional obligation to protect the Sixth Amendment right of a defendant to the effective assistance of counsel. I must also acknowledge, however, that a defendant has an equal Sixth Amendment right to represent himself without the assistance of counsel. *See Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). By threatening his court-appointed defense counsel with physical harm, Thomas has forfeited his Sixth Amendment right to counsel. By delaying trial with unreasonable demands upon counsel-despite my warnings of the consequences of such unreasonable dilatory tactics—Thomas has also waived by conduct his Sixth Amendment right to counsel. I must construe Thomas' conduct as a tacit request to proceed *pro se*, and no additional attorneys, other than standby counsel, will be appointed to assist him.

An appropriate order follows.

### *ORDER*

AND NOW, this *19th* day of April 2002, it is hereby ORDERED AND DIRECTED that the petition of defendant's counsel for leave to withdraw, dkt. no. 65, is granted. No additional attorney to represent the defendant in this action shall be appointed, although the Court will appoint an attorney to serve as standby counsel for the purposes of trial. The parties and standby counsel shall be prepared to select a jury on Monday, May 13, 2002.