EBEL, J.,
dissenting.
Contrary to the majority opinion, I would hold that the district court erred by denying Simpson his constitutional right to represent himself. Therefore, I would reverse the convictions. Since I do not prevail on that issue, I am also writing separately to supplement the majority’s reasoning on the pole-camera video evidence. On that issue, I agree with the majority that there was no error regarding the exclusion of that evidence insofar as the search warrant was concerned— and, regarding the use of that evidence for impeachment at trial, Simpson has not satisfied the third prong of plain-error review. I write separately only because of the potential for a new trial here during which Simpson will have a new opportunity to request inspection of the pole camera video evidence for trial purposes. In that eventuality, if Simpson were to preserve the issue properly, I believe he has offered a theory of materiality that satisfies his prima facie burden under Federal Rule of Criminal Procedure 16. Thus, if the government chooses to retry Simpson on the remanded counts, Simpson should be allowed to examine the pole-camera evidence.
I. Right to self-representation
The majority opinion finds two reasons why Simpson’s self-representation motion was defective — that it was not “clear and unequivocal” and that it was a delay tactic.
A. Clear and unequivocal
Our case law requires a “clear and unequivocal” request to dispense with counsel. While the majority opinion concludes that Simpson’s request was not clear enough, the district court did not address that question and the government never argued it below or on appeal.[1] So at the outset I am skeptical of relying on an argument that was neither argued below nor preserved on appeal.[2]
*1065 Simpson in fact did clearly and unequivocally invoke his constitutional right to represent himself. On the morning of trial, Simpson submitted a handwritten motion for self-representation, which unambiguously asserted his right to proceed pro se. (Motion to Proceed in Propria Persona, Sui Juris, R. Vol. I at 183-84) (“Comes now, Michael E. Simpson, the Accused, proceeding in Propria Persona, Sui Jurist,] and respectfully moves this court to grant the above entitled motion[.]”). His motion cites and explains the touchstone Supreme Court case recognizing that constitutional right, Faretta v. California, 422 U.S. 806, 819-820, 95 S.Ct.2525, 45 L.Ed.2d 562 (1975), and enumerates reasons why he was dissatisfied with his lawyer, many of which had only arisen within the preceding few days. This unambiguous written request should be the end of the matter.
But the majority finds ambiguity in that document because it also requests the appointment of advisory counsel for several purposes, including assistance with discovery procedures.[3] (Maj. Op. at 1046-47). Contrary to the majority opinion, I would not read this reference to discovery as “implicitly” requesting a continuance, (Maj. Op. at 1047), thereby muddying the clarity of the written motion for self-representation. -Instead, the discovery reference only suggests that Simpson hoped his separate oral motion for a continuance would be granted, and that an advisory lawyer could assist with discovery matters before the newly scheduled trial date. But even assuming there was an implicit request for a continuance in the written motion for self-representation, it would not dilute the clarity of his distinct request for self-representation. It is difficult to imagine how a defendant could be any more “clear and unequivocal” than what Simpson wrote in this motion.
The majority then turns to the oral colloquy between the trial court and Simpson to find ambiguity where, in my view, there is none — at least none attributable to Simpson. The record shows that Simpson (1) asked to represent himself and, because he was not prepared to do so that day, he (2) requested a continuance. These are two separate, but related, motions. I agree with the majority that the district court “conflated” them. (Maj. Op. at 1047-48). But the majority concludes this confla *1066 tion was reasonable, and thus not erroneous, because of a particular back-and-forth between Simpson and the district court. That conversation is worth considering again:
THE COURT: Okay. So, Mr. Simpson, let me just ask you this, and that is is [sic] what you are — you are asking for a continuance, but you are also asking to represent yourself in this proceeding, but with advisory counsel appointed?
THE DEFENDANT: Yes.
THE COURT: Would you be prepared to go to trial today representing yourself?
THE DEFENDANT: No, sir, not today.
R. Vol. Ill at 167. When Simpson said he would not be prepared for trial that day, the district court was assuming that Simpson only wanted to represent himself if he received a continuance, i.e., that the self-representation motion was conditional on moving back the trial date.
But that interpretation was unreasonable. The context of the conversation was whether to move back the trial date. As such, in responding that he was unprepared for trial that day, Simpson was simply arguing that the comt should grant the continuance based on his lack of preparedness — he did not in any way state, nor imply, that he would revoke his self-representation motion if a continuance was denied. To the extent that the district court believed otherwise, that was not Simpson’s fault. Even still, however, the majority holds that Simpson should have clarified that “he wanted to represent himself even without a continuance.” (Maj. Op. at 1048) (emphasis added). But our case law has never required that a defendant bolster an otherwise unmistakable motion for self-representation with a supplemental assertion that he remains earnest in that request notwithstanding the outcome on other pending motions.
The majority then turns to case precedent that found ambiguity in the request for self-representation under different circumstances. But those cases involved situations where there was far more doubt as to whether the defendants actually were invoking their self-representation right. In United States v. Miles, (cited by Maj. Op. at 1047-48, 1048), we found waiver of the self-representation right when the district court asked the defendant, “Are you now asking counsel to take over for you?,” to which he responded “I think, at this point, yes.” 572 F.3d 832, 837 (10th Cir. 2009). In other words, the defendant affirmatively declared he wanted his lawyer to take over for him. That did not happen here. In fact, just the opposite, as Simpson repeatedly expressed dissatisfaction with his lawyer and affirmatively asked to represent himself.
In Stallings v. Franco, (cited by Maj. Op. at 1048), an unpublished case, the defendant submitted multiple motions, one of which actually asked for appointment of a lawyer outside the Public Defender’s office, and another stated: “Although I did ask to go pro-se, I am not prepared at this time for trial, because I do not know the rules and procedures in a New Mexico jury trial.” 576 Fed.Appx. 820, 823 (10th Cir. 2014) (unpublished) (emphasis added). With no accompanying request for a continuance, and by prefacing his statement with the word “although,” it was reasonable for the district court in Stallings to conclude that he was qualifying or retreating from his earlier motion for self-representation.
In United States v. Smith, (cited by Maj. Op. at 1048-49), the Tenth Circuit did not expressly ground its decision on the ambiguity of the defendant’s request, but rather on its untimeliness. 413 F.3d 1253, 1279 (10th Cir. 2005) (after reviewing the law, including the “clear and unequivocal” stan *1067 dard, “we conclude that the District Court did not err when it found that [defendant] did not intend to abide by courtroom decorum and that his request was not timely made.”), abrogated on other grounds by Boyle v. United States, 556 U.S. 938, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009). That being said, the invocation of the self-representation right in Smith was woefully ambiguous. The district court even asked if the defendant sought to dispense with counsel, to which the defendant responded that “he did not have the education to represent himself and simply wanted new counsel.” Id. at 1279. But when the defendant indicated “he might have to be disruptive in trial in order to properly defend himself,” id. at 1280, the district court cautiously treated that statement as an assertion of the self-representation right. The defendant’s comments in Smith, unlike Simpson’s statements and written motion in our case, demonstrated a highly equivocal invocation of the right.
In United States v. Callwood, (cited by Maj. Op. at 1049), the defendant informed the district court that he “would prefer for counsel not to represent defendant or at least the right to question the witness himself.” 66 F.3d 1110, 1114 (10th Cir. 1995) (emphasis added). We held that, at most, he was requesting a “hybrid” representation where he could “question the witnesses while continuing to retain counsel.” Id. The majority today correctly characterizes Callwood as a case where the defendant “never made any other statement regarding his desire for self-representation.” Id. That case is a far cry from the one before us today. Simpson made clear his desire to go forward pro se in a separate written motion and in his colloquy with the district court.
In United States v. Bennett, 539 F.2d 45, 51 (10th Cir. 1976), (cited by Maj. Op. at 1049), the defendant repeatedly “vacillated]” between requests for hybrid-representation (splitting trial tasks between the defendant himself and trial counsel) and full self-representation. At one point, the defendant stated: “It is my statement now that I know I am not a qualified attorney to conduct a full trial, but there are certain aspects of the trial that I feel that I am competent to proceed with.” Id. at 50 (emphasis added). After the defendant changed his mind multiple times, the district court concluded: “we have fenced around long enough.” Id. Again, as in the previously cited cases, Bennett involved a degree of ambiguity that far exceeded the equivocation (if any) in Simpson’s colloquy with the district court in this case.
Although I believe the majority’s cited cases involved far more ambiguity than did Simpson’s colloquy here, I agree with the majority about the purpose of the “clear and unequivocal” standard from these cases — it is to avoid putting a district court in a dilemma where “an equivocal demand creates a potential ground for reversal however the trial court rules.” (Maj. Op. at 1047). If the court has to guess at what the defendant wants, then it may incorrectly determine that he either wanted to keep his lawyer (stripping him of a right to self-representation), or that he wanted to proceed pro se, thereby surrendering his constitutional right to counsel. So defendants can make ambiguous demands and then appeal their convictions no matter the court’s ruling.
But that dilemma did not exist here. With this record, had the district court granted the self-representation motion and Simpson lost at trial, Simpson could not have successfully argued post hoc that he was unconstitutionally denied the assistance of counsel — after all he waived that right by submitting a clear and unequivocal request to represent himself. He might have had at least a colorable claim that the *1068 court abused its discretion in denying his separate motion for a continuance, but that would have been a separate matter. As described above, the fact remains that any ambiguity was created by the district court itself — either by misunderstanding Simpson’s request, or by failing to treat separately his scheduling request (the continuance) from his motion to invoke a constitutional right (self-representation).
B. Purpose of delay
A motion for self-representation may be rejected if made for the purpose of delaying the proceedings. See United States v. Tucker, 451 F.3d 1176, 1180 (10th Cir. 2006); United States v. Mackovich, 209 F.3d 1227, 1237-38 (10th Cir. 2000). The government argues, and the majority today concludes, that Simpson’s request was a tactic for delay. I disagree.
At the outset, the district court never actually found that Simpson’s motion was made for the purpose of delaying the trial. The majority acknowledges as much, but references several statements that it concludes amounted to the district court’s “implicit” finding of intended delay. (Maj. Op. at 1053). I am wary to sign on to that approach.
Rather than hang the decision on implicit findings of the district court, I would instead rely on what the court said explicitly. In considering Simpson’s request for self-representation, the district court found that his earlier continuance request was “totally appropriate” and acknowledged that Simpson did not have “much control over that situation.”[4] (R. Vol. III at 169). Yet the majority dismisses this explicit finding as “not dispositive.” (Maj. Op. at 1055). In my view, this finding has meaning. It makes this case different from others like Mackovich, where the district court found the self-representation motion was “merely an effort to again delay the trial, and [was] an abuse of the judicial process,” 209 F.3d at 1237, and where the judge pointed to a long period of disruptive tactics by the defendant, id. Unlike in Mackovich, the district court here did not find that Simpson had demonstrated such a pattern of delay tactics.
Turning away from the district court’s findings, and looking to the record itself, it appears that Simpson chose to represent himself not to manipulate the process or delay the trial, but because he was genuinely dissatisfied with his lawyer. Consider first the explanation that Simpson actually offered, both in his written motion and in the colloquy. He explained that his motion was based on his lawyer’s failure to keep Simpson informed about case developments and the failure to file certain motions that Simpson believed were important to his defense. While a defendant’s purported intentions are not dispositive of whether a motion is intended for delay, they are at least a starting point for analyzing the purpose of the motion.
But the government dismisses Simpson’s explanation based on the timing of his request. The government argues that if Simpson decided to represent himself two weeks before trial, then why did he wait until the morning of trial to file the motion? The majority concludes that Simpson could have requested self-representation earlier, and his failure to do so suggests a purpose of delay. But I am not so sure.
Consider the sequence of events leading up to the district court’s denial of the motion on the morning of trial, April 6, 2015. A week and a half before the trial *1069 date, Simpson asked his lawyer to file certain jurisdictional motions which Simpson had written. But the lawyer found them frivolous and refused to file them.[5] Upon learning they were not filed, Simpson himself submitted them to the court on April 1. However, on April 2, the district court denied those motions because they were not filed by Simpson’s lawyer.[6] On April 3, a Friday, the parties held a pretrial conference at which Simpson learned that his motions were stricken. Over the weekend, on the eve of trial, realizing that his lawyer would not file his motions and that he could not file them himself so long as he had a lawyer, Simpson may have tossed up his hands and finally decided to act on his inclination to proceed pro se. That next Monday morning, April 6, 2015, he filed for self-representation.
With this sequence of events in mind, the timing of Simpson’s self-representation request does not suggest a purpose of delaying trial — but rather a late realization that his lawyer was not representing his perceived best interests and that the court would not consider his jurisdictional motions unless he dispensed with counsel.[7] Moreover, to confirm that his attempt to dispense with counsel was genuine, rather than a delay tactic, Simpson again sought to represent himself after the trial for sentencing proceedings. (Dist. Ct. Doc. 156, 158). In my view, that adds confirmatory support to the conclusion that Simpson had genuinely wanted to represent himself all along.
For the above reasons, I am not persuaded by the majority’s and the government’s arguments. More fundamentally, I am concerned that today’s decision will water down a constitutional right which ought to remain potent — the right to dispense with counsel. Because I find, on this record, no ambiguity in Simpson’s request, and no evidence that Simpson had a purpose of delay, I would reverse the convictions based on the district court’s denial of Simpson’s constitutional right to self-representation. Thus, on this issue, I respectfully dissent.
II. Pole-camera evidence
The majority also finds no reversible error in denying Simpson’s motion to inspect the pole camera and hard drive. On this issue, I concur in the majority’s outcome and rationale. I write separately on this issue only to add that, under Federal Rule of Criminal Procedure 16, the government cannot block access to potentially material evidence in its control when the defendant alleges a specific theory of how the evidence could be material to his defense, and where the specific evidence can *1070 not be knowable by the defendant until it is produced by the government for the defendant’s examination.
In Simpson’s original motion to inspect, he offered one theory of how the surveillance footage would be material to his defense: access to the video would enable him to challenge the search warrant based on reckless omissions by the affiant. The district court denied that motion, and the majority correctly affirms that denial because Simpson failed to make a prima facie showing that the video would be material to his effort to challenge the search warrant.
On appeal, for the first time, Simpson offers a second theory for why the video would be material: it would enable him to impeach the government’s star eyewitness at trial, Kenneth Tillman. I agree with the majority that Simpson has failed to establish a “reasonable probability” that this impeachment theory, if adopted by the district court, would have changed the outcome in the trial. (Maj. Op. at 1057). Thus, at this stage of the proceedings, where we are reviewing his claim for plain error, Simpson’s claim fails. But because we are remanding on some counts, there is a possibility of a new trial. If that occurs, the pole camera evidence may again become relevant and this time Simpson might timely ask to inspect that the pole camera and hard drive under the theory that it may help him impeach the government’s star eyewitness at trial. Thus, because of that eventuality, I would go further than the majority opinion. I would hold that Simpson’s impeachment theory is valid and satisfies his prima facie burden to show materiality under Federal Rule of Procedure 16, and thus the government must permit Simpson to examine the pole-camera evidence if the government pursues a new trial on any remanded counts.
Consider what the video evidence would allegedly show. The pole camera was installed across the street from Simpson’s home on June 5, 2015, and would. have captured footage of events occurring outside the residence after that date. Tillman, the government’s star eyewitness, claimed at trial that Simpson exited his home on June 12, 2015, brandishing a firearm, (R. Vol. III at 374), and then Tillman entered the house and Simpson began bragging about his other guns, (Id. at 376-77). But Simpson alleges the video footage would prove Tillman was never at the house on the dates claimed, and so could not have observed those events. It would also show, according to Simpson, a lack of traffic associated with drug dealing. All of this would be helpful to Simpson’s defense as impeachment evidence against Tillman— which would unquestionably be material in light of the fact that Tillman was the government’s only eyewitness.[8]
With this, Simpson has met his prima facie burden. At least under Rule 16, we should not fault Simpson for failing to prove in advance what the video would show. That would be circular — Simpson needs the video to prove he is telling the truth, he cannot be expected to first prove his story in order to get access to a video he says is the very item needed to prove that story.[9] Chief Justice John Marshall *1071 acknowledged this impossibility over two centuries ago: “Now, if a paper be in possession of the opposite party, what statement of its contents or applicability can be expected from the person who claims its production, he not precisely knowing its contents.” United States v. Burr, 25 F.Cas. 187, 191 (C.C.D. Va. 1807). And in a related context, the Supreme Court recognized that “it is impossible to say whether any information in the [sought-after] records may be relevant to [DefendantJ’s claim of innocence, because neither prosecution nor defense counsel has seen the information.” Pennsylvania v. Ritchie, 480 U.S. 39, 57, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (remanding to determine whether certain nondisclosed records, the information in which was unknown to all parties, would have changed the outcome of the trial if properly disclosed).[10]
A contrary conclusion would be a dangerous precedent in federal courts. To permit the government • to sit on allegedly unrecoverable evidence and prevent the defendant from determining whether the evidence is recoverable would allow the government to withhold potentially material evidence when the government alone can assess the usefulness of that evidence. See generally United States v. Budziak, 697 F.3d 1105,1113 (9th Cir. 2012) (“While we have no reason to doubt the government’s good faith in such matters [referring to Rule 16 requests], criminal defendants should not have to rely solely on the government’s word that further discovery is unnecessary,”). It is particularly disconcerting when the defendant, as here, alleges a specific purpose for the evidence that would be material to his legal defense. Thus, while I agree with the majority’s treatment of this issue in full, I would hold further that, upon a new trial, the government should allow inspection of the pole camera and hard drive.
[[Image here]]
In sum, on the issue of self-representation, I conclude that the district court erred by denying Simpson’s request. It was neither ambiguously invoked, nor motivated by a desire to delay. Thus, all of Simpson’s convictions should be reversed. However, since the majority disagrees *1072 with me on that dispositive issue, I turn to the evidentiary issue of discovery of the pole-camera and hard drive. On that matter, I concur with the majority that reversal is not warranted based on Simpson’s failure to satisfy plain-error review — but I have -written separately to add that the government’s refusal to allow inspection here was improper and, upon any new trial on the counts that are being remanded, the government should permit Simpson to examine the pole-camera and hard drive.

. See Oral Argument at 1:12-1:17 (statement by Simpson's counsel: “It's undisputed that the motion clearly and unequivocally requested self-representation_").

. At oral argument, Simpson’s counsel responded to the panel’s questions about whether the request was “clear and unequivocal,'' see Oral Argument at 1:36-4:42, but aside from that colloquy, there was no adversarial attention given to the topic. The majority says that the government had no reason to argue this below because Simpson made the request the day of trial and “the government was never asked for its position on self-representation.” (Maj. Op. at 1050). But as the majority *1065 acknowledges, Simpson filed a post-verdict motion for new trial raising this self-representation issue and' the government could have responded at that time. Further,- I disagree with the majority that the government eventually “spoke up” on appeal by arguing the motions for self-representation and continuance were "inherently linked.” (Maj. Op. at 1047-48). In that argument, the government was asserting that the two connected motions "support a finding that Simpson's request was untimely and manipulative,” (Aple. Br. at 12) — that is quite different from arguing the “clear and unequivocal” prong of the self-representation analysis. Moreover, the government cites to none of the cases relied upon by today's majority to find ambiguity in this' case, and so Simpson would have no opportunity to assist this Court in properly interpreting those authorities. It is for that reason, in part, that we should not rely on arguments that were not made by the parties.

. The motion says: “The appointment of advisory counsel can relieve the Judge of the need to explain and enforce basic rules of courtroom protocol or to assist the accused in overcoming routine procedural or evidentiary obstacles that stand in the way of the accused achievements of his own clearly indicated goals. U.S. v. Thomas, 220 F.Supp.2d 430 (W.D.Pa. 2002) [sic]. Also, such assigned counsel would be available at least to meet with the prosecuting attorney, tó see that discovery procedures are followed. The necessary motions are made, to confer with accused, to be present with the accused in the courtroom during trial, and otherwise to do those things associated with the case, which the accused is unable to do for himself.” (R. Vol. I at 184) (emphasis added).

. This was not Simpson’s first request for a continuance — his trial was originally scheduled for December 15, 2014, but after Simpson's family swapped out his lawyers (without his knowledge) at the last minute, the district court pushed the trial date back.

.There was certainly an adequate basis to believe they were frivolous. In one motion, Simpson argued he was a "Noble of the A1 Moroccan Empire” and thus not bound by the laws of the United States. (Dist. Ct. Doc. 127). In another, Simpson gave notice of a name-change based upon "Divine Law; Natures Law; Universal Law; Moorish Birthright; International Law; and Constitutional Law[.]" (Dist. Ct. Doc. 128). And another sought a copy of a “Certified Delegation of Authority Order” that showed the district court had jurisdiction to hear the case. (Dist. Ct. Doc. 129). Despite the frivolity of these motions, however, there is no indication that they were not genuine.

. When a defendant is represented by counsel, a court will not ordinarily accept pro se filings from that defendant. See United States v. Sandoval-De Lao, 283 Fed.Appx. 621, 625 (10th Cir. 2008) (unpublished) (collecting cases).

. The lateness of this decision itself does not make it untimely because, as the majority acknowledges, a motion for self-representation is timely if made before the jury is impaneled. See Tucker, 451 F.3d at 1181. Simpson’s motion was made before the jury was impaneled.

. It is generally said that, under Rule 16, "conclusory allegations of materiality[do not] suffice!.]” See, e.g,, United States v. Mandel, 914 F.2d 1215, 1219 (9th Cir. 1990). But Simpson does not just allege that the video would be material as a general matter — he claims a specific use (impeachment) with respect to a specific witness (Tillman), and even points out specific aspects of the video that would be exculpatory (Tillman’s absence on particular date). There is nothing conclusory about Simpson’s claim.

. The majority correctly cites to United States v. Acosta-Gallardo for the proposition that *1071 Brady's materiality requirement is not satisfied when "no one knows whether the [disclosed item] would have been favorable to [the defendant].” 656 F.3d 1109, 1117 (10th Cir. 2011). While Acosta-Gallardo makes it difficult for Simpson to satisfy plain error on his Brady argument, I do not view that case as dispositive of the alleged Rule 16 violation. Rule 16 is broader than the Brady rule. See, e.g., United States v. Muniz-Jaquez, 718 F.3d 1180, 1183 (9th Cir. 2013) ("Rule 16 is thus broader than Brady. Information that is not exculpatory or impeaching may still be relevant to developing a possible defense.”); United States v. Caro, 597 F,3d 608, 620 (4th Cir. 2010) (same); United States v. Baker, 453 F.3d 419, 424 (7th Cir. 2006) (same); Fed. R. Crim. P. 16 advisory committee’s note to 1974 amendment (stating that in revising Rule 16 "to give greater discovery to both the prosecution and the defense,” the committee had "decided not to codify the Brady rule”); 2 Charles Alan Wright, Federal Practice and Procedure § 256 (4th ed. 2009) (explaining that inculpatory material or ambiguous information falls outside the scope of Brady but is discoverable under Rule 16). The Brady rule is a constitutional floor — binding in federal and state courts alike — and the Federal Rules of Criminal Procedure may, as they have done in Rule 16, provide a federal standard above that floor. Thus, while the majority takes no position on this issue, I would note that Acosta-Gallardo 's holding on Brady's materiality requirement does not extend to the more defense-favorable standard under Rule 16.

. As the majority correctly points out, this case is not squarely on point — it addresses materiality in the context of a Brady violation, i.e., unconstitutional nondisclosure. But it is instructive that the Supreme Court has also found it unfair for a defendant, at least in the Brady context, to be forced to prove the materiality of a record he has not seen.